*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 13**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

DOUGLAS STEWART CARTER,
*Appellee*,

*v.*

STATE OF UTAH,
*Appellant*.

No. 20221116
Heard December 15, 2023
Filed May 15, 2025

On Direct Appeal

Fourth District Court, Provo
The Honorable Lynn W. Davis
The Honorable Derek P. Pullan
No. 150400825

Attorneys:

Eric Zuckerman, Salt Lake City, Jon M. Sands, Paula K. Harms, Phx., Ariz., for appellee

Derek E. Brown, Att'y Gen., Andrew F. Peterson, Deputy Solic. Gen., Daniel L. Day, Erin Riley, Asst. Solics. Gen., Salt Lake City, for appellant

JUSTICE PETERSEN authored the opinion of the Court, in which JUSTICE POHLMAN, JUDGE RYAN M. HARRIS, JUDGE AMY J. OLIVER, and JUDGE PAUL B. PARKER joined.

Having recused themselves, CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, and JUSTICE HAGEN do not participate herein; COURT OF APPEALS JUDGE RYAN M. HARRIS and COURT OF APPEALS JUDGE AMY J. OLIVER sat.

DISTRICT JUDGE RICHARD D. MCKELVIE retired after sitting for oral argument in this case. DISTRICT JUDGE PAUL B. PARKER participated as his replacement.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1 In 1985, Douglas Carter was convicted and later sentenced to death for the murder of Eva Olesen in Provo, Utah. There was no physical evidence tying Carter to the crime scene. But the investigation turned up other evidence pointing to Carter, and Carter ultimately signed a confession to the murder. At trial, two witnesses for the State—Epifanio Tovar and his wife Lucia—provided important testimony corroborating aspects of Carter's confession. They testified that they had seen Carter just before and after the murder, and that Carter had told Epifanio he murdered a woman and showed Epifanio how he had done it.

¶2 Decades later, however, the Tovars signed sworn declarations stating that during the investigation and prosecution of Carter, the police had threatened them, pressured them to make untrue statements, and instructed them to lie at Carter's trial about significant financial support they had received from the police. Based on these new revelations, Carter petitioned for postconviction relief under the Postconviction Remedies Act (PCRA). And the postconviction court in the Fourth Judicial District held an evidentiary hearing on Carter's petition.

¶3 After the evidentiary hearing, the court found that Carter's trial and sentencing were tainted by serious misconduct by the lead prosecutor, the lead investigator, and another police officer who was responsible for "tak[ing] care of" the Tovars. The postconviction court found that the lead investigator suborned perjury, telling Epifanio to falsely deny receiving financial assistance from the police and to falsely claim that Carter said he was going out to "rape" someone on the night of the murder. The other officer also instructed the Tovars to lie about receiving financial assistance from the police.

¶4 And the court found that Epifanio obliged. He lied to the jury on both points. He falsely testified that just before the murder, Carter said that he was going to go out and "rape, break, and drive." Also, when Epifanio was asked whether the police had provided him or his family with any financial assistance, he falsely claimed that he and his wife had received nothing more than a $14 witness fee. In truth, the postconviction court found that the Tovars

had received about $4,000 in financial assistance from the police in the months leading up to trial.

¶5    The prosecutor did not disclose any of this to the defense. And even though the prosecutor knew that the Tovars had received financial help from the police, the prosecutor did not correct Epifanio's false testimony on this point.

¶6    In light of these serious findings, the postconviction court concluded that the State had violated Carter's constitutional right to due process. First, it concluded the State had violated *Brady v. Maryland*, 373 U.S. 83 (1963), because it suppressed evidence that was favorable to Carter and material to both his guilt and sentence. Additionally, it concluded the State had violated *Napue v. Illinois*, 360 U.S. 264 (1959), because the prosecutor knowingly failed to correct Epifanio's false testimony. It then determined that these violations prejudiced Carter at the guilt and sentencing stages of his trial, explaining that its "confidence [was] undermined in both Carter's conviction and sentence." The court granted Carter's petition for postconviction relief, vacated his conviction and sentence, and ordered a new trial.

¶7    The State appeals the postconviction court's order. It is important to note that, for the most part, the State does not challenge the court's factual findings. Further, the State does not dispute that it wrongfully suppressed exculpatory evidence and that the prosecutor knowingly failed to correct at least one instance of false testimony. Rather, the State argues that the postconviction court used an incorrect legal standard in part of its prejudice analysis, and that overall, these constitutional violations did not prejudice Carter under the applicable PCRA standards.

¶8    We agree with the State that part of the postconviction court's prejudice analysis relied on an incorrect legal standard. However, applying the correct legal standard, there is no question that these numerous constitutional violations—suppressing evidence, suborning perjury, and knowingly failing to correct false testimony—prejudiced Carter at both his trial and sentencing. We affirm.

## BACKGROUND[1]

¶9    Eva Olesen was murdered in her Provo home in 1985. She was found by her husband with her "hands . . . tied behind her back, her clothes . . . removed from the waist down, and her sanitary pad . . . lying at her feet." *Carter v. State*, 2019 UT 12, ¶ 5, 439 P.3d 616. She had been stabbed ten times and shot in the back of her head. *Id.* Detectives recovered from the crime scene nineteen fingerprints, a blond hair fiber, a slug from a .38 special handgun, and one "unburned gun powder particle" lifted from a bloodstained pillow found near Mrs. Olesen's body.

### *The Investigation*

¶10   The Provo City Police Department assigned Lieutenant George Pierpont to lead the investigation. After a few weeks, the police received two tips that pointed to Carter as a potential suspect. First, a witness identified Carter as a possible suspect in a vehicle trespass offense that occurred near the Olesen home shortly before the murder. And second, the police learned that Carter's wife Anne had "rushed home after learning of the murder to see if Carter had been involved."

¶11   The police brought in Carter for questioning on two occasions. He admitted that he knew Mrs. Olesen because she had purchased Avon products from his wife. But he denied any involvement in the murder.

¶12   The following month, Anne Carter—who was in the process of divorcing Carter—made a statement to the police. She suspected that Carter may have used her .38 special handgun, which was missing, in the murder. She reported that Carter had

---

[1] At times, we reference some of our previous opinions in this case when describing the procedural history or the basic facts of the underlying case. The rest of this background is drawn from the trial court record and the record of the proceedings in the postconviction court, including the postconviction court's findings of fact and conclusions of law. We note, as did the postconviction court, that the postconviction court's findings "are based on evidence presented in this civil action for post[]conviction relief. If a new criminal trial is held, the jury will be tasked with making its own independent findings about the credibility of witness[es], the facts of the case, the guilt or innocence of Carter, and if necessary, what penalty should be imposed."

told her that on the night of the murder, he had visited his friend Epifanio Tovar. He said that two other people were at Epifanio's house, and one of them "held a grudge against Provo Police Chief Swen Nielsen, who was Mrs. Olesen's nephew." *Id.* ¶ 11. Anne said Carter told her that he and Epifanio's two friends went to the Olesens' home to steal a gold necklace, and he stayed in the car while the other two knocked on the door and went inside.[2] He claimed that he did not know what happened in the house, but when the two men returned to the car, they said that Mrs. Olesen was dead.

¶13  Anne allowed the police to search her home. They found several pieces of bloodstained clothing and some .38 caliber ammunition. However, the police ultimately determined that the blood on the clothes did not belong to Mrs. Olesen.

*Perla Lacayo*

¶14  As the investigation continued, Pierpont learned that in the days following the murder, Carter spent time with Perla Lacayo. Perla was a friend of Carter and the Tovars. Pierpont went to Perla's home to interview her but found her three children home alone. He called the Division of Child and Family Services to "take care of the children." About twenty minutes later, Perla returned home. Pierpont attempted to interview her about Carter, but she spoke Spanish and very little English. So Pierpont assigned Officer Richard Mack, a Spanish-speaking officer, to obtain her statement. When Mack arrived, Perla was "crying and obviously nervous."

¶15  Over the course of Mack's interview of Perla, she told him that she was a friend of Carter and Epifanio, and she had seen both of them recently. She had observed that over the last month, Carter had been acting strangely. He told her he was a suspect in Mrs. Olesen's murder, and he was going to leave for Chicago. Carter had recently given Perla a portable whirlpool bath. But when she looked inside it, she found a gun wrapped in a rag.

¶16  Perla told Mack that she and Epifanio had driven Carter to Wendover, Nevada, so Carter could catch a bus to Chicago. And although she initially denied it, Perla eventually informed Mack that Epifanio told her Carter had confessed to him about the

---

[2] For ease of reference, we refer to a number of individuals by their first names, with no disrespect intended.

murder. She provided Mack with details Epifanio said he had learned from Carter.

*Epifanio Tovar*

¶17 Based on this information, Pierpont arrested Epifanio for obstructing justice because he had driven Carter to Wendover, knowing Carter had committed murder. Pierpont interrogated Epifanio, who eventually admitted that on the night of the murder, Carter had confessed to killing a woman and had described how he shot and stabbed her. When Pierpont asked Epifanio if Carter enjoyed stabbing the woman, Epifanio answered, "No. He said it was awful after."

¶18 Later during the investigation, Mack interviewed Epifanio about whether he had any knowledge of the location of the gun that had been used in the murder. Epifanio said that he had seen the gun when it was purchased and in the "whirlpool machine at Perla's home," but that Carter "had never given him the gun to get rid of it."

*Lucia Tovar*

¶19 Pierpont assigned Mack to interview Lucia Tovar in Spanish. During the interview, Lucia told Mack that she was present during a conversation between Carter and Epifanio on the night of the murder and that they were "talking . . . about something she could not understand." Lucia also stated that she observed Carter "put his hands behind his back with the back of the wrists touching together," and that "while Carter spoke with her husband he was laughing."

*Carter's Confession*

¶20 Carter was eventually arrested in Nashville, Tennessee. Pierpont traveled there to interrogate Carter at the jail. Before Pierpont's arrival, Tennessee police interrogated Carter—for approximately two hours one day and four hours the next—about the facts and circumstances of Mrs. Olesen's death. Carter made no confessions during these interviews.

¶21 Yet, upon Pierpont's arrival, he interrogated Carter for about thirty minutes and then reported that he had obtained a verbal confession. However, Pierpont did not record the interrogation. He instead dictated a summary of the confession, and had the summary transcribed onto a one-page form. Carter signed the written confession.

¶22 Epifanio's and Lucia's statements to the police corroborated numerous details of Carter's confession. So for the eight to nine months before Carter's trial, Pierpont assigned Mack to "keep track of the Tovars." In this role, Mack was required to patrol the Tovars' residence and visit them "two to three times a week, maybe more." His objective was to make sure that they "didn't leave town for employment, or . . . go back to Mexico," and that "they were completely watched and taken care of" until trial. Mack "took care of the Tovars' daily living expenses," including providing them "money for rent, bills, and groceries."

*Preliminary Hearing*

¶23 At the preliminary hearing on the charges against Carter, the State called Epifanio, Lucia, Perla, and Pierpont to testify. Wayne Watson, an attorney for Utah County, was the prosecutor. Epifanio testified that Carter came to Epifanio's home twice on the night of the murder. As he was leaving the first time, Carter said he was "going to break into a car or steal some money." Returning two hours later, Carter announced to Epifanio that "he just killed a woman" by stabbing and shooting her. Epifanio recalled that a few days later he read a newspaper article about the murder that prompted him to ask Carter "if he had raped the woman." Carter said he did not because she was on her period. Finally, Epifanio testified that he saw Carter with a gun one time, "when he first purchased it."

¶24 Lucia testified at the preliminary hearing that Carter came to their house on the night of the murder and demonstrated what he had done. She said she observed a conversation between Carter and Epifanio but understood "very little." When asked to demonstrate for the court what she saw Carter doing, Lucia explained that "Carter got up where he was sitting and he lay down on the floor. . . . He bent a little bit and he put his hands on the back and he start moving his hand back and forth. He opened his legs and then he just bent more over."

¶25 Perla testified that she had known Carter for four years. She said that about one month after the murder, Carter told her that he was a suspect, and he gave her a whirlpool bath. About eight days later, Perla and Epifanio opened the box containing the whirlpool and saw a gun. Then, Carter told her that he needed to leave Utah because he "bit a lady in her mouth," so she and Epifanio drove Carter to Wendover in her car.

*1985 Criminal Trial and 1992 Resentencing*

¶26 At the trial, the State did not introduce any physical evidence tying Carter to the crime scene. Pierpont testified about Carter's confession to him. And Epifanio and Lucia's testimonies were important, because they both corroborated aspects of Pierpont's testimony about Carter's confession.

¶27 Epifanio testified to the same facts that he had recounted at the preliminary hearing, including Carter's telling of how he had entered the Olesens' home by threatening Mrs. Olesen with a gun, then stabbed and shot her. However, during direct examination, Epifanio attributed a statement to Carter that Epifanio had not previously mentioned. Watson asked, "What, if anything, did [Carter] tell you he was going to do when he left for the first time?"

> A: He was going to go rape, break, and drive.
>
> Q: And did he tell you that?
>
> A: Yes.
>
> Q: What's your best recollection . . . of what [Carter] told you he was going to do? Tell me what you remember him saying?
>
> A: That he was going to [go] break in[to] a house.
>
> Q: And what, if any, purpose did he tell you why he was going to do that.
>
> A: Needed money.

¶28 Another significant aspect of Epifanio's story had also changed. He admitted on direct examination that he had disposed of the murder weapon for Carter by throwing the gun in a river, and that he had informed the police of this on the Saturday before trial.

¶29 During cross-examination, defense counsel focused on this new revelation. After getting Epifanio to concede that before Saturday, the police had asked him about the location of the gun and he had claimed that "he didn't know anything about it," the following exchange took place:

> Q: Well, were you lying or were you telling the truth there?
>
> A: I was lying.

> Q: If I asked you right now as you sit there on the witness stand, how many other lies or how many other stories have you made up in this whole matter, that you could tell us, right in front of all the jury?
>
> A: Just one.
>
> Q: Just one lie?
>
> A: Yes.

¶30 However, "almost immediately after this exchange, [d]efense [c]ounsel turned to the question of monetary payments." And Epifanio denied receiving any financial benefits from the police.

> Q: Mr. Tovar, did you and or your family anytime between February and now receive money or support from Mr. Watson's office or from Mr. Pierpont, the police?
>
> A: Just, we just received fourteen dollars.
>
> Q: Just fourteen dollars?
>
> A: Yes, a check from the City.
>
> Q: Nothing else that they offered you or gave you to stay and be available because you had to be a witness in this case?
>
> A: No.
>
> Q: What about your family, your wife?
>
> A: No.
>
> Q: You are not on any kind of aid?
>
> A: No. They just gave us a check, one for each of us, since that last court.

¶31 Portions of Lucia's testimony are also relevant to this petition. Lucia testified, through a Spanish interpreter, about Carter's visits to the Tovars' home before and after the murder. However, her description of Carter's demeanor and his demonstration of the murder was more detailed and vivid than it had been in her first statement to Mack and in her preliminary hearing testimony. Lucia testified that: "[Carter] laid himself to the floor showing us exactly how he had forced this individual to lay down, and then he put his hands behind his back to illustrate how he had tied her hands behind her back." This was the only time

Lucia said that Carter had tied Mrs. Olesen's hands. She also described Carter's demeanor more vividly, stating that: "He laughed and laughed about something he had done. And I do not know if it was because he was nervous or why. But he continued to laugh." She recalled Carter "laughing and giggling" while "he kept repeating the same thing over and over again and he demonstrated about twice by laying down on the floor and explaining."

¶32 Lucia also described part of the conversation between Carter and Epifanio, even though they had been speaking in English. She said that Carter "told my husband of what he had done, but my husband said he was crazy . . . . Mr. Carter then told him 'I swear by my mother that that is true. . . . [W]atch the news.'"

¶33 Lucia was not asked about whether she had received any financial benefits from the police.

¶34 The State did not call Perla to testify at trial.

¶35 The jury found Carter guilty of first-degree murder with two aggravating factors: that "the defendant was engaged in the commission of or an attempt to commit aggravated burglary," and that the "homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner." The State had also charged Carter with rape as an aggravating factor. But the jury did not convict him of that aggravator. The next day, the jury sentenced him to death.

¶36 Carter appealed his conviction and sentence. And this court vacated his death sentence and remanded for a new sentencing trial. *State v. Carter*, 776 P.2d 886, 896 (Utah 1989).

¶37 Carter was resentenced in 1992. But the Tovars could not be located before the resentencing trial. Consequently, the prosecutor read portions of Epifanio's trial testimony and all of Lucia's trial testimony to the jury. In closing arguments, the prosecutor emphasized Epifanio's testimony that Carter stated his intent to "rape, break, and drive," and Lucia's testimony that Carter was "laughing and giggling" while demonstrating the murder. The jury resentenced Carter to death. *Carter*, 2019 UT 12, ¶ 29.

*Postconviction Proceedings and Evidentiary Hearing*

¶38 In 2011, Carter's postconviction counsel located the Tovars in Mexico. Both of them provided a sworn declaration. Epifanio declared that the police had threatened him with deportation and removal of his infant son; paid for his family's rent, phone, utility bills, and groceries; and told him to deny he had received any

financial benefits if asked about it at trial. *Id.* ¶¶ 30–31. Lucia declared that her testimony at trial about the conversation between Epifanio and Carter was based on what her husband told her after the interaction, not her firsthand knowledge. She also stated that the police had threatened to deport them and had paid for their rent and bills, but that the police told them to deny receiving any benefits at trial. *Id.* ¶ 32.

¶39 Based on the declarations, Carter petitioned for postconviction relief. The postconviction court dismissed the petition on summary judgment. But Carter appealed that decision, and we reversed and remanded the case for an evidentiary hearing. *Id.* ¶¶ 4, 35–37, 41–42.

¶40 In 2021, the postconviction court held a four-day evidentiary hearing at which Carter presented testimony from nine witnesses, including Epifanio, Lucia, Mack, and Wayne Watson. Epifanio and Watson did not testify in person at the hearing. Rather, the parties deposed both men, and Carter offered portions of the depositions at the hearing. The State presented testimony from Perla, Mack, and Pierpont.

¶41 During his video deposition, Epifanio affirmed almost everything he said at trial about Carter's confession to him. However, he testified that Carter did not say before the murder that he was going to go "*rape*, break, and drive"; rather, Carter said that he "was going to break into a car and steal from the car." (Emphasis added.) Epifanio explained that he testified falsely "[b]ecause that's what [the police] wanted me to say." Epifanio testified that before trial he met with Watson and Pierpont to discuss his trial testimony, and it was in this meeting that the phrase, "rape, break, and drive," came up.

¶42 Epifanio also admitted that he lied at trial when he testified that he and Lucia only received $14 checks from the city. He stated that, in truth, the police "would pay my rent. They would buy me food. They would pay for my expenses, my services, like my phone, electricity and water; gas." Epifanio explained his false testimony as follows:

> Q: And why did you lie about the items that you received from the police?
>
> A: Because they asked me not to say anything.
>
> Q: Do you remember when they said that?
>
> A: A little before the trial.

Q: Do you remember which officer told you that?

. . . .

A: Yes; it was Richard Mack.

Q: And was he the only officer that told you to lie?

A: No.

Q: Which other officer?

A: Pierpont.

¶43 Epifanio also expressed that when he was first interviewed while under arrest, he was concerned because he and Lucia were not legal residents of the United States:

Q: How did you feel—how did you feel when you testified [at] trial?

A: I was scared.

Q: And what did you think would happen to you, if you did not lie to the jury about the items you received like the police told you to do?

A: I thought they would put me in jail and take my son away and deport my wife.

. . . .

Q: Why did you lie to the jury when you testified that Doug Carter said he was going to rape, break and drive?

. . . .

A: Because they had told me they would accuse—they would accuse me of being an accomplice, and that they would put me in jail and that they would deport my wife and that they would take my son away.

¶44 Epifanio further testified that he felt like the police treated him as a suspect and that during his interrogation, Pierpont was trying to get him to say things that were not true by pressuring Epifanio with references to the death penalty and "that they had witnesses against me." Epifanio testified that he thought it was Pierpont who told him not to say anything about the police paying his rent and other expenses. When asked why he lied, Epifanio

testified: "I was afraid and that's why I lied, because . . . if they didn't catch the guy, they would arrest me as the murderer."

¶45 At the evidentiary hearing, Lucia also affirmed the substance of her trial testimony. However, she took back some of the detail she had provided in her trial testimony. At trial, Lucia testified that Carter was "laughing and giggling" while demonstrating the murder, and that he "laid himself to the floor showing us exactly how he had forced this individual to lay down, and then he put his hands behind his back." Lucia also recalled details from the English conversation between Epifanio and Carter, testifying that Carter told Epifanio what he had done, declaring, "'I swear by my mother that that is true. . . . [W]atch the news.'"

¶46 At the evidentiary hearing, Lucia recalled, "Yes, he was demonstrating something on the floor and, yes, he was laughing." But she testified that she did not understand anything that Carter said to her husband because "[t]hey were speaking in English." When asked to recall the demonstration, Lucia testified that she "can't remember . . . very well, whether [Carter] . . . was [laughing] when he was lying down." And she stated that she did not have any idea what Carter was demonstrating, nor did she know that Carter was demonstrating something he had done to another person. Finally, Lucia testified that Mack had threatened Lucia and her husband with arrest, deportation, and loss of their son more than three times between her first meeting with Mack on the day he came to arrest Epifanio and her trial testimony, including a threat "not to say anything regarding the assistance [the police] were giving us."

¶47 Transcripts from Wayne Watson's deposition were also admitted at the evidentiary hearing, because Watson passed away between his deposition and the hearing. Watson disagreed that the Tovars were important witnesses, stating that he "didn't even need [the Tovars]" and "might have thrown them in for extra source." Regarding monetary payments, Watson testified that Provo City paid the Tovars' rent "for a month or two." Watson recalled that the Tovars "didn't have any money, didn't have a job and had to go—leave Utah to go somewhere else . . . and that [Provo City] paid their rent in the apartment they were living." He said that "George [Pierpont] told [him]" about the payments. Attached to Watson's deposition was an exhibit that included a handwritten note found in Watson's file, which said, "Epifanio—$ only / deposit on apartment / deposit on phone." Watson conceded that the handwriting was his own.

¶48 Mack testified that because he spoke Spanish, he was assigned to be the primary contact with the Tovars. His objective was to "make sure that—that they were taken care of to where they didn't leave town for employment, or—or that they didn't go back to Mexico or—or—that they were completely watched and taken care of." As part of that effort, Mack "provided the Tovars with items of financial value" including money for bills, groceries, and rent that was $400 a month, over a period of eight to nine months prior to trial. He testified that he was "just following orders" and that he was "sure" Pierpont knew about the payments; and in fact, Pierpont told Mack to pay the Tovars' rent.

¶49 Pierpont testified that he was the lead investigator of the major case squad and was assigned by his supervisor, Captain Warren Grossgebauer, to direct the investigation into Mrs. Olesen's murder and make assignments to others. He testified that either he or Grossgebauer assigned Mack to provide extra patrols around the Tovars' residence and to take care of their needs. He recalled that the police could have paid for the Tovars' rent and groceries, but that he did not remember ordering or intending this. Pierpont further testified that the sole purpose in assigning Mack was "to protect the Tovars."

¶50 The State called Perla to testify. Although it chose not to call Perla as a witness during the 1985 trial, the State called Perla at the evidentiary hearing to present counterfactual evidence— meaning evidence the State contends it would have offered at trial if the suppressed impeachment evidence had been disclosed and had damaged the Tovars' credibility. During Perla's hearing testimony, counsel for the State asked Perla about the initial statement Mack took from her. For example, counsel asked, "[D]o you remember that you told Officer Mack [that] on . . . February 27th . . . [Carter] was at . . . Epifanio's house and from there he left?" Perla answered, "I don't remember"—an answer she gave more than one hundred times at the hearing. She testified that she was "really scared" when interviewed by the police because "they—the police came into my house with the gun looking for [Carter], and the intimidation they're going to take my kids away." She confirmed that she remembered telling Mack that she and Epifanio drove to Wendover, and on the drive home he told her the "real reason" Carter was leaving was because of "a lady that was dead." And she remembered that Epifanio told her what Carter said to him about the murder on two occasions.

*The Postconviction Court's Order*

¶51   After the hearing, the postconviction court issued an order granting Carter's petition, which included the following findings of fact and conclusions of law.

*The Postconviction Court's Factual Findings*

¶52   The court found that at Pierpont's direction, Mack paid the Tovars over $4,000 in benefits in the months preceding Carter's trial. Further, the court found Pierpont's claim that the payments were only for the Tovars' protection to be not credible. Rather, it found the police paid the Tovars "to ensure their continued availability and cooperation as trial witnesses," which made them "dependent upon and beholden to the police." Watson knew of the payments to the Tovars. But the State never disclosed the payments to the defense.

¶53   Next, the court found that Mack threatened Lucia and Epifanio with "arrest, deportation, and loss of their son . . . at least three times," and that Pierpont did so at least once. Mack told the Tovars, "as long as you're working with us, [deportation] was not going to happen." The court found that "[t]his was a threat that if the Tovars stopped cooperating with the police, deportation would ensue." The State never disclosed to the defense that Mack and Pierpont had made these statements to the Tovars.

¶54   Further, the court found that Pierpont and Mack instructed the Tovars to give false testimony at trial, and that neither the coaching nor the falsity of the testimony was disclosed to Carter.

¶55   First, it found that "Mack instructed the Tovars to lie about receiving financial benefits from the police if asked about the benefits at trial." Notably, Mack denied this at the evidentiary hearing, but the court "[did] not find this testimony credible." Watson was present when these instructions were given. And the court observed that both Watson and Pierpont—who both knew that the Tovars had received significant financial assistance—were present at trial, sitting at counsel table, when Epifanio lied about the benefits, "not once, but five times." The State did not disclose to the defense that Mack had instructed Epifanio to lie, nor that Epifanio's testimony was false. Importantly, the court also found that Watson did nothing to correct the false testimony at trial.

¶56   Second, the court found that "Pierpont instructed Epifanio to testify falsely that Carter said he was going to 'rape, break, and

15

drive' before the murder." Watson was at the pretrial meeting when the phrase "came up." However, the court found that Carter failed to prove that Watson personally knew the phrase "rape, break, and drive" was false. The court found it was "undisputed" that Epifanio did lie to the jury when he testified that Carter made the statement. And the State did not disclose to the defense that Pierpont had coached Epifanio to testify falsely, nor that Epifanio's testimony was false.

*The Postconviction Court's Legal Conclusions*

¶57 Based on these findings, the postconviction court concluded that the State had violated Carter's right to due process at both the guilt and sentencing stages of his trial in numerous ways. The court concluded that the State had violated *Brady v. Maryland*, 373 U.S. 83 (1963), because it had suppressed evidence favorable to Carter, which was material to both guilt and punishment. *See id.* at 87. Specifically, the court found that the State suppressed evidence that: the police threatened the Tovars with deportation, arrest, and separation from their son; the police paid the Tovars approximately $4,000 for living expenses; Mack and Pierpont coached the Tovars to deny receiving financial benefits; and Pierpont coached Epifanio to testify falsely that Carter said he was going to "rape, break, and drive," before the murder.

¶58 In light of the fact that Epifanio succumbed to the coaching and testified falsely, the court also determined that the State violated *Napue v. Illinois*, 360 U.S. 264 (1959), because the prosecutor did not correct Epifanio's false testimony. With respect to Epifanio's testimony that he had received no benefits from the police, the court concluded that Watson violated *Napue* because he knew the testimony was false and did not correct it. With respect to Epifanio's "rape, break, and drive" testimony, the court imputed Pierpont's knowledge that the phrase was fabricated to Watson. On this basis, the court concluded that Watson's failure to clearly correct the perjury was a second *Napue* violation.

¶59 Finally, the court concluded that these constitutional violations prejudiced Carter—both under *Brady* and *Napue*'s materiality standards, *Brady*, 373 U.S. at 87; *Napue*, 360 U.S. at 270–72, and under the PCRA's prejudice standards, UTAH CODE § 78B-9-104(2)(a), (b).

¶60 With respect to the *Brady* violations, the court applied two different materiality standards that were dependent on the type of evidence suppressed. The court first considered whether Carter

had shown that if the State would have properly disclosed the threats and the payments, there was "a reasonable probability that . . . the result of the trial would have been different." The court determined that these two pieces of impeachment evidence were insufficient to create such a possibility.

¶61 But the court observed that the materiality of *Brady* violations is not determined individually, but collectively. So it then turned to the State's failure to disclose the two instances of the police coaching the Tovars to lie. The court applied the *Napue* standard to these claims, stating that the "materiality of undisclosed false testimony is presumed . . . [and] [t]he burden then shifts to the State to show that the failure to disclose is harmless beyond a reasonable doubt." The court concluded that the State had not met this burden, and therefore the suppressed evidence was material under *Brady*.

¶62 And considering the first two violations in combination with the undisclosed false testimony, the court concluded that "the four failures to disclose proved by Carter undermine this Court's confidence in the verdict." The court also ruled that these violations prejudiced Carter in the sentencing phase.

¶63 The court then viewed the four violations under the applicable PCRA prejudice standard. UTAH CODE § 78B-9-104(2)(a). It referenced the analysis it had conducted under *Brady*, and ruled that "for th[ose] reasons . . . had the State disclosed to Carter the financial benefits paid on behalf of the Tovars, the police threats of arrest, deportation, and separation, and the coaching of Epifanio's false testimony by police . . . there would have been a reasonable probability of a different verdict in both the guilt phase and the sentencing phase of Carter's trial." (Citing *id.*)

¶64 The court then analyzed the two *Napue* violations— Watson's failure to correct Epifanio's denial that he had received payments from the police and Epifanio's claim that Carter said he was going to "rape, break, and drive" before the murder. The court concluded that, for the reasons it had given in its *Brady* analysis, these violations were prejudicial under *Napue* and the applicable PCRA standard because "the false testimony, in any reasonable likelihood, could have affected the judgment of the factfinder." *Id.* § 78B-9-104(2)(b).

¶65 The postconviction court granted Carter's petition for postconviction relief, vacated his conviction and death sentence, and ordered a new trial. The State appeals.

¶66 We have jurisdiction under Utah Code subsection 78A-3-102(3)(i).

## STANDARD OF REVIEW

¶67 "On appeal from a ruling on a petition for post-conviction relief, we review the post-conviction court's legal conclusions for correctness . . . [and its] factual findings for clear error." *Oseguera v. State*, 2014 UT 31, ¶ 9, 332 P.3d 963 (cleaned up).

## ANALYSIS

¶68 Carter seeks relief under the PCRA, which establishes the sole statutory "remedy for any person who challenges a conviction or sentence for a criminal offense and who has exhausted all other legal remedies." UTAH CODE § 78B-9-102(1)(a). The PCRA contains a list of "grounds for relief." *Id.* § 78B-9-104. The one asserted by Carter is that his "conviction was obtained or the sentence was imposed in violation of the United States Constitution or Utah Constitution." *Id.* § 78B-9-104(1)(a). To obtain postconviction relief on either of these bases, Carter must prove (1) a constitutional violation, and (2) that, "in light of the facts proved in the postconviction proceeding, viewed with the evidence and facts introduced at trial or during sentencing," *id.* § 78B-9-104(2), he "suffered prejudice as a result of this constitutional error," *Arriaga v. State*, 2020 UT 37, ¶ 30, 469 P.3d 914 (citing UTAH CODE § 78B-9-104(2)).

¶69 To prove the constitutional violations he has alleged, Carter must satisfy the materiality requirements that are embedded in *Brady* and *Napue* claims. Once he has done that, he must then show that these constitutional violations prejudiced him under the standards established in the PCRA. *See* UTAH CODE § 78B-9-104(2). Fortunately, the PCRA's prejudice standards harmonize with *Brady* and *Napue*'s materiality standards.

¶70 We first review the postconviction court's conclusion that, in numerous instances, the State violated Carter's constitutional right to due process at trial. With one exception, the State does not dispute the substance of the constitutional violations identified by the postconviction court. Rather, the crux of the State's appeal is that the postconviction court erred in determining that these constitutional violations prejudiced Carter under the applicable caselaw and the PCRA. So we then analyze the court's prejudice determinations. We elucidate how to make a collective prejudice determination when multiple *Brady* and *Napue* violations—which

have different materiality standards—are at issue. And while we find some analytical mistakes in the court's analysis, we conclude that the postconviction court's ultimate determination that the constitutional violations prejudiced Carter under the PCRA was correct.

## I. CONSTITUTIONAL VIOLATIONS

¶71 Carter asserts he has grounds for relief under the PCRA because his "conviction was obtained" and his "sentence was imposed in violation of the United States Constitution." UTAH CODE § 78B-9-104(1)(a). In his petition, Carter asserted two types of constitutional violations, both implicating his right to due process of law under the Fourteenth Amendment of the United States Constitution. Carter claimed that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), because it failed to disclose impeachment evidence that was favorable to the defense. And he asserted violations of *Napue v. Illinois*, 360 U.S. 264 (1959), because the prosecutor knowingly failed to correct false testimony.

¶72 After the evidentiary hearing, the postconviction court concluded that Carter had proven multiple due process violations.

### A. Brady *Violations*

¶73 The court concluded that Carter had shown the State violated *Brady* in obtaining his conviction and sentence. In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "To establish a *Brady* violation, a defendant must show (1) that the prosecution suppressed evidence, (2) that the evidence is favorable to the accused, and (3) that the evidence is material to either guilt or to punishment." *State v. Newton*, 2020 UT 24, ¶ 37, 466 P.3d 135. We discuss and apply the *Brady* materiality standard below. *See infra* ¶¶ 91–97, 136–153.

¶74 The postconviction court found multiple instances of the State suppressing evidence that was favorable to Carter.

¶75 It found that "the police had paid more than $4,000 in financial benefits to or on behalf of the Tovars" before trial, and the State did not disclose this to the defense. The court concluded the payments rendered the Tovars "dependent upon and beholden to the police," and that this was impeachment evidence favorable to

Carter because the defense could have used it to argue that the Tovars had a motive to testify falsely on behalf of the State.

¶76 Next, the court found that the police had threatened the Tovars with arrest, deportation, and separation from their son, and that the State did not disclose this to the defense. It concluded that this was impeachment evidence favorable to Carter because he could have used it to show that the Tovars had "a motive to misrepresent or slant their testimony in ways favorable to the State."

¶77 Finally, the court found that Pierpont and Mack had instructed the Tovars to lie at trial on two points. It found that Mack coached the Tovars to deny they had received benefits from the police if asked about it at trial. In response, Epifanio perjured himself by claiming, repeatedly, that he and Lucia had received nothing but $14 checks from the city for being witnesses. Additionally, Pierpont instructed Epifanio to claim that Carter said he was going to "rape, break, and drive" before the murder. And Epifanio did falsely testify that Carter made this statement on the night of the murder.

¶78 The court found that the State did not disclose the coaching to the defense. And it concluded this was impeachment evidence favorable to Carter because "the police interfered with the truth-seeking function of the criminal justice process" and this "call[ed] into question the integrity of the police investigators and their investigation generally."

¶79 The State does not dispute that this evidence was suppressed, nor that it was favorable to Carter and should have been disclosed under *Brady*. We agree with the postconviction court that all the suppressed evidence could have been used to impeach the credibility of important state witnesses—the Tovars, Pierpont, and Mack. And generally, impeachment evidence is "favorable to [the] accused" under *Brady*. 373 U.S. at 87; *United States v. Bagley*, 473 U.S. 667, 676 (1985).

*B.* Napue *Violations*

¶80 The postconviction court also concluded that Carter had established two due process violations under *Napue*, which applies when a conviction is "obtained through use of false evidence, known to be such by representatives of the State," and also "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269. This applies even

20

where "the false testimony goes only to the credibility of the witness." *Id.* The Court explained that this was so because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Id.* Indeed, in *Napue* itself, the Court reversed a murder conviction because an important government witness testified that "he had received no promise of consideration in return for his testimony" when in fact the prosecutor had made such a promise and "did nothing to correct the witness'[s] false testimony." *Id.* at 265.

¶81   To establish a *Napue* violation, Carter must show that "the prosecution knowingly solicited false testimony or knowingly allowed it to go uncorrected when it appeared," and that the testimony was material in that it "in any reasonable likelihood could have affected the judgment of the jury." *Glossip v. Oklahoma*, 145 S. Ct. 612, 626–27 (2025) (cleaned up). We discuss and apply the *Napue* materiality standard below. *See infra* ¶¶ 90–99, 132–135.

¶82   The postconviction court concluded that the State violated *Napue* when Watson: (1) failed to correct Epifanio's false testimony that he received only a $14 check for being a witness, and (2) failed to correct Epifanio's false testimony that Carter said he was going to "rape, break, and drive" on the night of the murder.

¶83   The State does not challenge that Watson violated *Napue* when he failed to correct Epifanio's denial of receiving payments from the police. But it disputes that Watson's failure to correct Epifanio's "rape, break, and drive" testimony constituted a *Napue* violation because the court found that Watson did not actually know the testimony was false. Rather, the court concluded as a legal matter that because Pierpont knew the testimony was false, and Pierpont was a member of the "prosecution team, his knowledge of false testimony is imputed to Watson, the prosecutor." The court reasoned that "[f]or purposes of *Brady*, a police investigator's knowledge of exculpatory evidence is imputed to the prosecutor." (Citing *Tillman v. State*, 2005 UT 56, ¶ 27, 128 P.3d 1123.) And the court saw "no reason why this same principle should not apply when a police investigator coaches a prosecution witness to testify falsely."

¶84   The State argues that the prosecutor's actual knowledge of the falsity of the evidence is an essential element of a *Napue* claim. (Citing *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 831 (10th

Cir. 1995) (concluding that a *Napue* violation was avoided because, even though a state investigative employee was aware of false testimony, the prosecution did not have actual knowledge of the false testimony).) In the State's view, a rule imputing a police investigator's knowledge of false testimony to the prosecutor cannot apply to a *Napue* claim because that would require a prosecutor to correct testimony that the prosecutor does not know is false. *Cf. Napue*, 360 U.S. at 269–71.

¶85 The State contends that the postconviction court's extension of this rule from the *Brady* context to a *Napue* claim "made new law." *See Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995) (holding that under *Brady*, the duty to disclose favorable evidence is implicated even if the evidence is known only to police investigators and not the prosecutor). The State asserts that the court's rule contradicts at least three federal circuits, including the Tenth Circuit Court of Appeals. (Citing *Smith v. Massey*, 235 F.3d 1259, 1272 (10th Cir. 2000) ("[T]his court and the Fifth Circuit have refused to impute the knowledge of a law enforcement officer to the prosecution where there has been an alleged *Napue* violation."), *abrogated on other grounds by Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001).)

¶86 It appears that the question of whether, in a *Napue* claim, the knowledge of a member of the prosecution team that testimony is false should be imputed to the prosecutor has not been specifically resolved by the U.S. Supreme Court. *Cf. Briscoe v. LaHue*, 460 U.S. 325, 326 n.1 (1983) ("The Court has held that the prosecutor's knowing use of perjured testimony violates due process, but has not held that the false testimony of a police officer in itself violates constitutional rights."). The question has caused a split among several federal courts of appeal. *See Massey*, 235 F.3d at 1272 (discussing cases and determining that it would not impute law enforcement agent's knowledge that testimony was false to the prosecutor).

¶87 We do not resolve this issue for ourselves here, however, because it does not ultimately matter to the resolution of this petition. The failure to disclose the falsity of Epifanio's testimony that Carter had a premeditated intent to "rape" on the night of the murder is clearly a due process violation under *Brady*, at a minimum. The only question is whether it constitutes a more serious violation under *Napue*, and is therefore subject to the less onerous *Napue* materiality standard. But as we will discuss, *infra* ¶¶ 128–130, 138–143, even if we consider this violation under the

22

higher *Brady* materiality standard, the cumulative effect of the violations is still prejudicial.

¶88 We now turn to the State's primary argument that the postconviction court's prejudice analysis is legally flawed, and that under the correct standards Carter has not shown prejudice.

II. PREJUDICE/MATERIALITY STANDARDS

¶89 The State contends that the postconviction court's prejudice determination was erroneous. Prejudice presents a legal question that we review for correctness. *See Arriaga v. State*, 2020 UT 37, ¶ 31, 469 P.3d 914 (describing the prejudice standard under the PCRA as "equivalent to the prejudice analysis courts use to assess ineffective-assistance-of-counsel claims"); *State v. Torres-Orellana*, 2024 UT 46, ¶ 7, 562 P.3d 706 (confirming in the context of an ineffective assistance claim that a prejudice determination is a question of law reviewed for correctness).

¶90 We begin by articulating the materiality standards applicable to *Brady* and *Napue* violations. We then discuss the PCRA's prejudice standards. And finally, we give guidance on determining prejudice when multiple *Brady* and *Napue* violations are at issue.

*A. Materiality Standards Under* Brady *and* Napue

¶91 The U.S. Supreme Court's articulation of the materiality standard for suppressed exculpatory evidence has developed over time. In *United States v. Agurs*, the Court spoke broadly about "the rule of *Brady v. Maryland*," and observed that it "arguably applies in three quite different situations," each involving "the discovery, after trial of information which had been known to the prosecution but unknown to the defense." 427 U.S. 97, 103 (1976).

¶92 The first situation the Court identified was where "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Id.* In such a situation, the Court stated that it had "consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside *if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.*" *Id.* (cleaned up) (emphasis added). This is the *Napue* standard. *Id.* at 103 n.8 (citing *Napue*, among other cases).

¶93 *Agurs* then discussed two other scenarios differentiated by whether and how specifically the defense had made a pretrial

request for exculpatory information. *Id.* at 104–07. While the details are not relevant here, the Court concluded that different materiality standards should apply where the defense made "a pretrial request for specific evidence," as opposed to no request or only a general request. *Id.* at 104.

¶94 Then, in *United States v. Bagley*, the Court streamlined the materiality standards it had elucidated in *Agurs*. 473 U.S. 667, 678–82 (1985) (opinion of Blackmun, J.); *id.* at 685 (White, J., concurring in part and concurring in the judgment). It first returned to the circumstance of "the prosecutor's knowing use of perjured testimony or, equivalently, the prosecutor's knowing failure to disclose that testimony used to convict the defendant was false." *Id.* at 678. The Court reiterated the "well-established rule that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair[] and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (cleaned up). The *Bagley* Court noted that this standard derived from *Napue*, and it likened the standard to a harmlessness review of a constitutional error — in other words, that the knowing use of perjured testimony "is considered material unless failure to disclose it would be harmless beyond a reasonable doubt."[3] 473 U.S. at 679–80 & n.9. The Court left this standard unchanged.

---

[3] In subsequent cases, the Court noted that in *Bagley*, it "treated 'reasonable likelihood' as synonymous with 'reasonable possibility' and thus ha[s] equated materiality in the perjured-testimony cases with a showing that suppression of the evidence was not harmless beyond a reasonable doubt." *Strickler v. Greene*, 527 U.S. 263, 298–99 (1999) (Souter, J., concurring in part) (citing *United States v. Bagley*, 473 U.S. 667, 678–80 & n.9 (1985) (opinion of Blackmun, J.)); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (defining the harmless-beyond-a-reasonable-doubt standard as no "'reasonable possibility' that trial error contributed to the verdict"); *Chapman v. California*, 386 U.S. 18, 24 (1967) ("There is little, if any, difference between our statement . . . about whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (cleaned up)).

¶95 But the Court reconsidered the necessity of applying different materiality standards based on whether the defense had requested the information, or how specific such a request had been. It concluded that a single prejudice standard was "sufficiently flexible to cover all instances of prosecutorial failure to disclose evidence favorable to the accused," without regard to whether the defense had made a specific request. Courts should simply determine whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 685 (White, J., concurring in part and concurring in the judgment); *id.* at 682 (opinion of Blackmun, J.) (cleaned up).[4]

¶96 Thus, due process violations that fall within the ambit of *Napue* are material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Glossip v. Oklahoma*, 145 S. Ct. 612, 626–27 (2025) (cleaned up) (analyzing a *Napue* violation arising in a capital case); *Bagley*, 473 U.S. at 678 (opinion of Blackmun, J.). *Napue* covers a variety of scenarios, but they all involve the presence of false evidence at trial, which was known to the prosecutor, including "the prosecutor's knowing use of perjured testimony," *Bagley*, 473 U.S. at 678 (opinion of Blackmun, J.), "the prosecutor's knowing failure to disclose that testimony used to convict the defendant was false," *id.*, and instances where the prosecutor, "although not soliciting

---

[4] The section of *Bagley* that we discuss, Part III, was written by Justice Blackmun and joined by Justice O'Connor. *Bagley*, 473 U.S. at 678–84. Justice White, joined by Chief Justice Burger and Justice Rehnquist, concurred in part and concurred in the judgment. *Id.* at 685. As explained in his concurrence, Justice White's divergence from Part III was narrow. He agreed with Justice Blackmun that, "for purposes of this inquiry, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* And he also agreed that the reasonable probability standard was flexible enough "to cover all instances of prosecutorial failure to disclose evidence favorable to the accused." *Id.* However, he differed from Part III in that he "s[aw] no reason to attempt to elaborate on the relevance to the inquiry of the specificity of the defense's request for disclosure." *Id.* He would have simply held that the "proper standard is one of reasonable probability." *Id.*

false evidence, allows it to go uncorrected when it appears," *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

¶97 And all other instances of "prosecutorial failure to disclose evidence favorable to the accused" are subject to the streamlined *Brady* materiality standard established in *Bagley*. 473 U.S. at 682 (opinion of Blackmun, J.). These *Brady* violations are material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*; *id.* at 685 (White, J., concurring in part and concurring in the judgment).

¶98 Notably, the *Napue* standard sets a lower bar for petitioners than the *Brady* materiality standard. While *Napue* asks whether the failure to correct false testimony "could . . . in any reasonable likelihood have *affected the judgment of the jury*," 360 U.S. at 271 (emphasis added), *Brady* requires a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, *the result of the proceeding would have been different*," *Bagley*, 473 U.S. at 682 (opinion of Blackmun, J.) (emphasis added); *id.* at 685 (White, J., concurring in part and concurring in the judgment).

¶99 *Napue*'s lower materiality standard reflects the fact that "[a] prosecutor's knowing use of perjured testimony is misconduct that goes beyond the denial of a fair trial, which is the focus of *Brady*. It is misconduct that undermines fundamental expectations for a 'just' criminal-justice system." *United States v. Garcia*, 793 F.3d 1194, 1208 (10th Cir. 2015). While both *Brady* and *Napue* establish violations of due process, the difference between the two is that "a *Brady* claim is concerned primarily with disclosure of exculpatory material *to the defendant*, whereas the essence of a [*Napue*] violation is the lack of disclosure of the truth *to the jury*." *Young v. Comm'r of Corr.*, 294 A.3d 29, 44 (Conn. App. Ct. 2023) (cleaned up). As the Supreme Court observed in *Napue*: "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the [State's] attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." 360 U.S. at 269–70 (cleaned up).

### B. *Materiality Standards Under the PCRA*

¶100 Now that we have discussed the applicable materiality standards under federal constitutional jurisprudence, we turn to the PCRA's prejudice standards. As the State correctly observes, while a petitioner must satisfy the materiality standards in *Brady* and *Napue* to make out those particular constitutional violations, in order to obtain relief under the PCRA based on those constitutional

violations, the petitioner must show that the violations were prejudicial under the standards contained in the PCRA itself. Those standards are found in subsections 2(a) and 2(b), which provide:

> The court may not grant relief from a conviction or sentence unless in light of the facts proved in the postconviction proceeding, viewed with the evidence and facts introduced at trial or during sentencing:
>
> > (a) the petitioner establishes that there would be a reasonable likelihood of a more favorable outcome; or
> >
> > (b) if the petitioner challenges the conviction or the sentence on grounds that the prosecutor knowingly failed to correct false testimony at trial or at sentencing, the petitioner establishes that the false testimony, in any reasonable likelihood, could have affected the judgment of the fact finder.

UTAH CODE § 78B-9-104(2).

¶101 Thus, for Carter to obtain relief from his conviction or sentence under the PCRA on the ground that his conviction and sentence were obtained in violation of the constitution, he must establish those constitutional violations under applicable law, and then establish prejudice under subsection 104(2). Conveniently, the PCRA's prejudice standards mirror the materiality standards found in *Brady* and *Napue*.

¶102 The prejudice standard established in subsection 2(a) is equivalent to the *Brady* materiality standard. *See Carter v. State*, 2019 UT 12, ¶ 55, 439 P.3d 616 (explaining that "the materiality standard under *Brady* is the same materiality standard contained in the PCRA"); *see also Arriaga*, 2020 UT 37, ¶ 31 n.37 (explaining that by employing "term of art" legal tests, the PCRA incorporates the "accompanying well-developed body of . . . jurisprudence"). Accordingly, when petitioners establish materiality under *Brady*, they have also established prejudice under subsection 2(a) of the PCRA. *See Carter*, 2019 UT 12, ¶ 55.

¶103 Similarly, subsection 2(b) aligns with the *Napue* materiality standard. Like *Napue*, subsection 2(b) applies where a postconviction petitioner "challenges the conviction or the sentence on grounds that the prosecutor knowingly failed to correct false

testimony at trial or at sentencing."[5] UTAH CODE § 78B-9-104(2)(b). In such cases, the petitioner demonstrates prejudice under the PCRA by proving "that the false testimony, in any reasonable likelihood, could have affected the judgment of the fact finder." *Id.* And, as with *Brady* and subsection 2(a), when petitioners challenge their conviction "on grounds that the prosecutor knowingly failed to correct false testimony at trial or at sentencing," and they establish prejudice under *Napue*'s materiality standard, they have also established prejudice under subsection 2(b) of the PCRA.

### C. *Making a Collective Prejudice Determination When Both* Brady *and* Napue *Claims Are at Issue*

¶104 Where, as here, multiple violations of *Brady* or *Napue* are at issue, "materiality . . . must be evaluated in the context of the entire record." *Tillman v. State*, 2005 UT 56, ¶ 32, 128 P.3d 1123. This means that although courts may "'evaluate the tendency and force of the undisclosed evidence item by item,' it is the collective weight of the evidence that is considered when evaluating materiality." *Carter*, 2019 UT 12, ¶ 53 (quoting *Kyles v. Whitley*, 514 U.S. 419, 436 & n.10 (1995)).

¶105 Determining the collective weight of the suppressed *Brady* evidence and the false *Napue* evidence is complicated by the fact that *Brady* and *Napue* claims involve different prejudice standards. The Ninth Circuit Court of Appeals has observed the tension courts face in determining which standard to apply when faced with a combination of *Brady* and *Napue* claims:

> Although we must analyze *Brady* and *Napue* violations "collectively," the difference in the materiality standards poses an analytical challenge. The *Napue* and *Brady* errors cannot all be collectively analyzed under *Napue*'s "reasonable likelihood"

---

[5] We note that the language of subsection 2(b) does not comprehensively track all of the scenarios in which a *Napue* violation might arise. *See supra* ¶¶ 80–81. It is not clear whether this means that the subsection 2(b) prejudice standard should be limited to only a slice of potential *Napue* claims, or if the language effectively includes instances where a prosecutor knowingly uses or fails to disclose false evidence at trial, since, in doing so, it may be said that they also failed to correct the false evidence. This question is not before us now. We simply make this observation, as it may arise in another case.

> standard, as that would overweight the *Brady* violations. On the other hand, they cannot be considered in two separate groups, as that would fail to capture their combined effect on our confidence in the jury's decision.

*Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008).

¶106 We have not addressed how to determine prejudice in such a situation. But several other courts have. *See, e.g., id.; Juniper v. Davis*, 74 F.4th 196, 212 (4th Cir. 2023); *United States v. Vozzella*, 124 F.3d 389, 392 (2d Cir. 1997). Under the approach of these jurisdictions, courts first "consider the *Napue* violations collectively" under the *Napue* standard, and if they "are not material standing alone," then, second, the courts "consider all of the *Napue* and *Brady* violations collectively" under the *Brady* standard. *Jackson*, 513 F.3d at 1076; *see also Juniper*, 74 F.4th at 213 (utilizing a similar two-step process).

¶107 We adopt this approach, with the caveat that a reviewing court is free to proceed directly to considering all of the mixed violations under the more-demanding *Brady* standard if that is preferable in a given case.

¶108 We now analyze the State's argument that the postconviction court erred in its determination that Carter was prejudiced at trial and sentencing by the State's *Brady* and *Napue* violations.

III. PREJUDICE AT CARTER'S TRIAL AND SENTENCING

¶109 The State's primary argument is that the postconviction court erred in its prejudice determination because it applied two different materiality standards to the four *Brady* violations at issue here, based on the type of evidence that was suppressed. It contends that one materiality standard applies to all *Brady* claims. And it argues that the court's use of the wrong *Brady* standard tainted its entire prejudice analysis—including its analysis under *Napue* and the PCRA—and resulted in impermissibly shifting the burden to the State to prove harmlessness. The State asserts that under the correct standards, Carter did not prove that any *Brady* or *Napue* violation prejudiced him at the guilt or sentencing phases of his case.

¶110 In conducting its prejudice analysis, the postconviction court first considered the prejudice caused by the four *Brady* non-disclosure violations it had discerned: (1) failure to disclose that the

police paid the Tovars approximately $4,000 in living expenses prior to trial; (2) failure to disclose that the police threatened the Tovars with deportation, separation from their son, and arrest; (3) failure to disclose that police coached Epifanio to falsely deny he had received any benefits; and (4) failure to disclose that Pierpont had coached Epifanio to say that Carter said he was going to "rape, break, and drive" before the murder.

¶111  The State is correct that in analyzing the materiality of the *Brady* violations, the postconviction court used two different materiality standards "depending on the type of evidence suppressed." With respect to the first two violations—the State's failure to disclose the payments and the threats—the court applied the *Brady* standard, concluding that they were material if there was "a reasonable probability that if the evidence had been disclosed the result of the trial would have been different." But with respect to the State's failure to disclose the two instances of the police coaching the Tovars to lie, the court applied an equivalent to the *Napue* materiality standard. It concluded that "[i]f the prosecutor knowingly fails to disclose that testimony used to convict the defendant is false, 'the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt.'" (Quoting *United States v. Bagley*, 473 U.S. 667, 680 (1985) (opinion of Blackmun, J.).) It explained further that "the materiality of undisclosed coached testimony is presumed" and "[t]he burden then shifts to the State to show that the failure to disclose is harmless beyond a reasonable doubt."

¶112  Considering the suppression of the payments and threats under the *Brady* standard, the court determined that these two pieces of impeachment evidence were insufficient to create a "reasonable possibility that if the evidence had been disclosed the result of the trial would have been different." The court reasoned:

> At the evidentiary hearing, the Tovars testified about the financial benefits and threats, but nevertheless stood by their testimony that Carter had returned to their home and confessed to murdering the victim. The Tovars do not claim to have lied because of the financial benefits paid to them or because of the threats of arrest, deportation, and separation from their son. Moreover, the jury was aware that the Tovars were not legal residents of the United States. And Carter's defense lawyer argued to the jury that

Epifanio was not a citizen and was "desperate about staying in this country."

¶113 But the court observed that the materiality of *Brady* violations is not determined individually, but collectively. So it then turned to the State's failure to disclose the two instances of the police coaching the Tovars to lie. It applied the harmless-beyond-a-reasonable-doubt standard to these claims, because,

> Both Watson and Lieutenant Pierpont knew that Epifanio's testimony about only receiving a $14 check from the City was false. Lieutenant Pierpont knew that Epifanio's testimony about "rape, break and drive" was false, and his knowledge is imputed to Watson. The State knowingly failed to disclose that the testimony was false and coached by police. Carter's conviction was secured—at least in part—on the basis of this false testimony. Therefore, the materiality of these non-disclosures is presumed and the burden shifts to the State to show that the failures to disclose were "harmless beyond a reasonable doubt."

¶114 The court concluded that the State had not met this burden. It explained that the prejudice caused by the suppression of this evidence

> must be evaluated in light of the fact that no physical evidence tied Carter to the crime scene. The State's case rested on the confession, and the Tovars' corroborating testimony. Carter's theory was that Epifanio was lying and that Carter's confession was coerced by unscrupulous police officers. In this context the failure to disclose that Epifanio lied about material facts under oath during trial and that he did so at the direction of the police was prejudicial to Carter's defense.

¶115 The court observed that the suppressed evidence would have damaged the Tovars' credibility, which was crucial to the State's case. The court reasoned that, because there was no physical evidence tying Carter to the crime scene, "[t]he Tovars provided critical testimony about Carter's whereabouts before and after the murder." The court noted that "Epifanio alone testified about what Carter admitted to him immediately after the murder." And "the Tovars described for the jury Carter's demonstration of what he

had done." The court also weighed the fact that the Tovars' testimony "corroborated Carter's oral and dictated confession to Lieutenant Pierpont." The court found their testimony to be "central to the State's case against Carter."

¶116 The court also noted that the suppressed evidence would have made the defense strategy of "attack[ing] Epifanio as a false witness" much more compelling. On cross-examination, defense counsel focused on Epifanio's "admitted lie about the location of the gun." And the court observed how much more powerful this defense strategy would have been if the jury would have been told that "contrary to his claim to have only lied one time (i.e. about the gun)—Epifanio had lied multiple times right there on the witness stand, under oath and before the jury, about facts material to his own bias and Carter's stated intent prior to the murder."

¶117 Additionally, the court weighed the fact that the jury would have learned that it was Pierpont who directed Epifanio to lie. And "[t]his would have undermined the integrity of both the police investigators and their investigation generally."

¶118 The court reasoned that the damage to Pierpont's credibility would have affected the jury's consideration of Carter's confession. Pierpont was the only person to witness Carter's confession, and he was the one to testify about it at trial. The court concluded that the suppressed evidence "would certainly have called into question Lieutenant Pierpont's testimony about Carter's unrecorded oral confession, and the somewhat inconsistent written confession Lieutenant Pierpont dictated in his own words for Carter to sign."

¶119 In light of all this, the postconviction court concluded that the State "ha[d] not shown that its failure to disclose Epifanio's coached false testimony would have been 'harmless beyond a reasonable doubt.'"

¶120 The court then considered the first two violations in combination with the undisclosed false testimony, and it concluded that "the four failures to disclose proved by Carter undermine [the] Court's confidence in the verdict."

¶121 The court then analyzed whether the *Brady* violations prejudiced Carter in the sentencing phase. It concluded that they had.

¶122 The court focused on the undisclosed evidence that Pierpont had directed Epifanio to falsely claim that Carter intended

to "rape, break, and drive" on the night of the murder. It pointed to the fact that at the 1992 resentencing, the prosecutor "relied heavily upon the statement in seeking the death sentence." During the State's closing argument, the prosecutor asked the jury to "[c]onsider the intent of the Defendant. . . . He said why he was going out that night. He wanted money, he wanted to 'rape, break, and drive.' He wanted to hurt someone. He wanted to get something for himself. He went in there intending to do violence. And then he exposed and brutalized the woman." Then, in rebuttal, the prosecutor argued that the murder was "not in retaliation to [Carter's wife] or anyone else. He decided to go out and 'rape and . . . break and drive.'"

¶123  The postconviction court concluded that "[e]vidence that Carter, shortly before the murder, expressed a wanton desire to rape someone, break someone or something, and flee may well have persuaded the jury that Carter was so culpable and dangerous as to require imposition of the death penalty." It concluded that the State had "failed to prove that its failure to disclose this false testimony was harmless beyond a reasonable doubt."

¶124 The court then viewed the four violations under the PCRA subsection 2(a) standard. UTAH CODE § 78B-9-104(2)(a). It concluded that, "[f]or the reasons stated above . . . had the State disclosed to Carter the financial benefits paid on behalf of the Tovars, the police threats of arrest, deportation, and separation, and the coaching of Epifanio's false testimony by police . . . there would have been a reasonable probability of a different verdict in both the guilt phase and the sentencing phase of Carter's trial."

¶125 Next, the court analyzed whether the two *Napue* violations prejudiced Carter under *Napue* and the PCRA standard found in subsection 2(b). It concluded that "for the reasons stated" in its *Brady* analysis, Watson's failure to correct Epifanio's false testimony that he had not received payments from the police and that Carter intended to "rape, break, and drive" before the murder "could have affected the judgment of the jury in the guilt phase of the trial." And "for the reasons stated" in its *Brady* analysis, the "rape, break, and drive" testimony "could have affected the judgment of the jury in the penalty phase." Thus, the court concluded that these violations were prejudicial under *Napue* and subsection 2(b).

¶126 The State argues that the court erred in its prejudice analysis when it applied the wrong prejudice standard to the

suppressed evidence of coaching and shifted the burden to the State to show those violations were harmless beyond a reasonable doubt. We agree. However, we conclude that the court was correct in its final determination that all the *Brady* and *Napue* errors, considered together, prejudiced Carter at the guilt and sentencing phases under the PCRA.

¶127 To begin, we agree with the State that under the PCRA, the burden to show prejudice rests with Carter. Both subsection 2(a), the general PCRA prejudice standard, and subsection 2(b), the standard that applies when "the petitioner challenges the conviction or the sentence on grounds that the prosecutor knowingly failed to correct false testimony," make clear that a court may not grant relief unless "*the petitioner establishes*" prejudice under the applicable standard. UTAH CODE § 78B-9-104(2)(a), (b) (emphasis added).

¶128 We also agree that the court's application of the less onerous *Napue* standard[6] to the suppressed evidence of coaching was incorrect. This seems to have stemmed from the court's consideration of both the evidence that Mack and Pierpont coached the Tovars to lie and the evidence of Epifanio's false testimony when determining whether these two *Brady* violations were material. The State correctly points out that "[t]he *Brady* evidence Carter claimed wasn't disclosed was that pretrial, the police coached Epifanio to say that he only received $14 and to say 'rape, break and drive.' The *Brady* claims would still fall under the normal *Brady* . . . prejudice standard. . . . Once Epifanio testified falsely about those things, they then became *Napue* claims analyzed under its less-stringent prejudice standard."

¶129 We agree with this, with one exception. Whether the materiality of Epifanio's false testimony about Carter's premeditated intent to rape is measured under the *Napue* standard depends on whether the prosecutor knew or should have known the evidence was false. *United States v. Agurs,* 427 U.S. 97, 103

---

[6] The "harmless beyond a reasonable doubt" standard has been described as equivalent to the *Napue* standard—i.e., whether there is "any reasonable likelihood that the false testimony could have affected the jury's verdict." *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985) (opinion of Blackmun, J.). However, for the sake of consistency, we will use the articulation of the *Napue* standard that appears in subsection 2(b).

(1976). And in this case, that depends on whether Pierpont's knowledge should be imputed to Watson. *See supra* ¶¶ 81–85. As stated above, we do not resolve that legal question here because it does not impact the outcome of this case. Thus, for purposes of this appeal, we will apply the *Brady* standard to the suppressed evidence of Epifanio's false testimony about Carter's intent to rape on the night of the murder.

¶130 Accordingly, only the prejudicial effect of Epifanio's false testimony that he received no financial benefits from the police should be considered under the *Napue* / subsection 2(b) standard. The remaining undisclosed evidence should be weighed under the *Brady* / subsection 2(a) standard. This includes the evidence that: (1) the police threatened the Tovars, (2) the police paid the Tovars over $4,000 in living expenses in the months leading up to trial, (3) Mack directed the Tovars to lie about the payments, (4) Pierpont directed Epifanio to falsely attribute to Carter a premeditated intent to rape someone on the night of the murder, and (5) Epifanio acceded to the coaching and falsely claimed that Carter said he was going to "rape, break, and drive" on the night of the murder.

¶131 With that established, we consider the State's argument that under the correct standards, Carter has not shown that the combined *Napue* and *Brady* violations prejudiced him. This determination requires considering the prejudicial effect of multiple violations under two different standards. We will first consider the effect of Epifanio's false denial of receiving payments under the less demanding *Napue* / subsection 2(b) standard. If it is prejudicial on its own, then the analysis is at an end. If it is not, then we will consider all the violations, including the *Napue* violation, under the higher *Brady* / subsection 2(a) standard.

Napue / *subsection 2(b)*

¶132 To determine whether a *Napue* claim is material, we ask whether "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *see also* UTAH CODE § 78B-9-104(2)(b).

¶133 The only *Napue* violation at issue is Watson's knowing failure to correct Epifanio's false testimony that he and Lucia received nothing more than $14 checks from the City. At trial, defense counsel cross-examined Epifanio on whether he or his family received "money or support" or "any kind of aid" from the police or prosecutor's office. Epifanio testified that he and his wife had each received a $14 check, and he affirmed four more times that

they received no other benefits. Watson knew this was false because he was aware that the Tovars were receiving financial benefits such as money, a "deposit on [an] apartment," and a "deposit on [a] phone." So Watson "knowingly failed" to correct Epifanio's false testimony.

¶134 If the jury would have known the truth, that the police paid the Tovars' living expenses during the months before trial, it could have led to fruitful cross-examination by the defense that would have diminished the Tovars' credibility. More importantly, if the jury knew that Epifanio lied under oath about this fact, it would have been highly damaging to his credibility. On the other hand, we also consider the postconviction court's finding that Epifanio was a credible witness at the evidentiary hearing. And at that hearing, he testified that the financial benefits did not cause him to lie, and that he told the truth about Carter coming to his home and confessing to murdering a woman.

¶135 Assuming, arguendo, that this single *Napue* violation was insufficient to "in any reasonable likelihood have affected the judgment of the jury," *Napue*, 360 U.S. at 271; *see also* UTAH CODE § 78B-9-104(2)(b), when viewed with the remaining violations cumulatively under the *Brady* / subsection 2(a) standard, we agree with the postconviction court that the violations were material.

### Brady / *subsection 2(a)*

¶136 To determine whether a *Brady* claim is material, we ask whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682 (opinion of Blackmun, J.); *id.* at 685 (White, J., concurring in part and concurring in the judgment). The general prejudice standard under the PCRA is substantively similar, requiring the petitioner to establish "that there would be a reasonable likelihood of a more favorable outcome." UTAH CODE § 78B-9-104(2)(a).

¶137 Although part of the postconviction court's *Brady* analysis utilized the wrong materiality standard, the substance of its analysis was comprehensive, careful, and based upon extensive and detailed factual findings that were the product of its firsthand observation of the evidentiary hearing. *See supra* ¶¶ 109–126.

¶138 First, we agree with the postconviction court that the violations clearly prejudiced Carter at sentencing. The postconviction court focused on the fact that the prosecutor in the

1992 resentencing argued in closing that Carter had a premeditated intent to "rape" and to "hurt someone," and that "[h]e went in there intending to do violence." But that evidence was false, the result of Pierpont's coaching. Epifanio testified at the evidentiary hearing that Carter actually told him he was going to "break into a car and steal from the car."

¶139  This was material to sentencing. The jury was falsely told that on the night of the murder, Carter intentionally sought out a victim with an intent to rape, hurt, and do violence to her. In reality, he told Epifanio that he was going to go break into a car.

¶140  The State argues that the nondisclosure of this coached, false testimony did not prejudice Carter at sentencing, because many other aggravating factors were before the jury. And it asserts that Carter's confession and the crime scene demonstrated that at some point, Carter had contemplated raping Mrs. Olesen but decided against it because she was menstruating.

¶141  We agree with the State that the murder of Mrs. Olesen was especially brutal and heinous, and that the crime scene suggested that the assailant contemplated sexually assaulting her at some point. However, the *premeditated* intent of a defendant convicted of murder is extremely important at sentencing. If the State had disclosed that Epifanio lied when he claimed that Carter left his home with an intent to rape—and not only that, but that the lead investigator had coached him to say so, we must conclude that there would have been a reasonable likelihood of a more favorable outcome at the sentencing phase of Carter's trial.

¶142  Next, with respect to whether the numerous due process violations cumulatively prejudiced Carter at the guilt phase of his trial, we ultimately agree with the postconviction court that they did. The State argues that none of the suppressed evidence or false testimony mattered, because Carter was convicted based on his "incontrovertible and . . . unchallengeable confession and its consistency with the evidence." Along the same lines, the State contends that any damage the evidence would have done to the Tovars' credibility "wouldn't have mattered" because their testimony "was merely corroboration of Carter's confession," and at the evidentiary hearing, they stood by their trial testimony about what Carter "told and showed them he had done." Finally, the State points to the counterfactual evidence it could have offered at the 1985 trial if Epifanio's credibility became too damaged—Perla's testimony about Epifanio's statements to her on the drive back

from Wendover, which mirrored his trial testimony and were made before he had any incentive or pressure to fabricate.

¶143  We agree with the substance of the postconviction court's analysis of the impact that the undisclosed threats, payments, coaching, and false testimony had on Carter's trial. When viewed under the *Brady* / subsection 2(a) standard, we conclude that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

¶144  The court correctly observed that because no physical evidence tied Carter to the crime scene, his confession and the Tovars' corroboration of his confession were the pillars of the State's case. And the undisclosed evidence damages both pillars.

¶145  We first discuss Carter's confession. After Carter was arrested in Tennessee, Pierpont traveled there to interrogate him. But before he did, Tennessee officers interrogated Carter for approximately two hours one day and four hours the next. During this time, Carter made no admissions. However, upon Pierpont's arrival, he claimed to have obtained an oral confession from Carter within thirty minutes. But Pierpont did not record the interrogation. Instead, he dictated a summary of the confession and had his summary transcribed onto a one-page form, which Carter signed.

¶146  Thus, Carter's confession was introduced at trial through Pierpont, who was the only one to witness Carter's initial oral confession. Pierpont was the lead investigator, and he sat with Watson at counsel table throughout the trial. The defense's theory was that Carter's confession was coerced by unscrupulous police officers. If it had been disclosed that Pierpont coached Epifanio to lie about Carter's intent before the murder, pressured the Tovars with threats of deportation and separation from their son, and knew Epifanio had been coached to lie about receiving payments from the police, this would have given the defense powerful material to use against Pierpont on cross-examination and it would have seriously damaged Pierpont's credibility. While the State is correct that this does not renew questions about the confession's admissibility as an evidentiary matter, the point here is that the jury likely would have given the confession less weight based on Pierpont's tarnished credibility and his demonstrated willingness to manufacture evidence against Carter in order to secure a conviction.

¶147 With respect to the Tovars, and especially Epifanio, we agree with the postconviction court that their testimony was central to the State's case. They saw Carter before and after the murder. And Epifanio's testimony about Carter's statements and demonstration of the murder provided important corroboration of Carter's confession. The defense strategy was to paint Epifanio as a false witness. If the *Brady* and *Napue* evidence were disclosed—the threats, the payments, the coaching, and Epifanio's false testimony—the defense could have shown that Epifanio did, in fact, perjure himself under oath at trial. And they could have developed his motive for doing so—fear of deportation, arrest, and separation from his family, as well as financial dependence on the police. At the evidentiary hearing, Epifanio testified that Pierpont was trying to get him to say things that were not true by pressuring him with references to the death penalty and claiming "that they had witnesses against [him]." He explained: "I was afraid and that's why I lied, because . . . if they didn't catch the guy, they would arrest me as the murderer." With Epifanio's credibility damaged, the corroborative force of his testimony would have been diminished.

¶148 Lucia's testimony at the evidentiary hearing suggests that her testimony may have been swayed by the threats and payments. Although Lucia affirmed the core substance of her trial testimony, it became evident that some of her trial testimony had been exaggerated, and some was not based on her firsthand knowledge. At the hearing, she took back some of the detail she had provided in her trial testimony.

¶149 At trial, Lucia testified that Carter was "laughing and giggling" while demonstrating the murder, and that he "laid himself to the floor showing us exactly how he had forced this individual to lay down, and then he put his hands behind his back." But at the evidentiary hearing, she stated that she did not have any idea what Carter was demonstrating, nor did she know that Carter was demonstrating something he had done to another person.

¶150 At trial, Lucia testified to overhearing parts of the English conversation between her husband and Carter, testifying that Carter told Epifanio what he had done, declaring, "'I swear by my mother that that is true. . . . [W]atch the news.'" But at the evidentiary hearing, she testified that she did not understand anything that Carter said to her husband because "[t]hey were speaking in English."

¶151 The State argues that if the credibility of Pierpont and the Tovars had been damaged, the State would have called Perla at the 1985 trial. And her testimony about what Epifanio told her on the drive back from Wendover would have buttressed Epifanio's testimony and the authenticity of Carter's confession. While Perla was a recalcitrant, biased, and forgetful witness at the evidentiary hearing, this may not have been the case had the State called her as a witness in 1985. We will assume for purposes of this appeal that she would have been at least as effective as she was at the preliminary hearing.

¶152 The question is, would her testimony have been enough to stem the damage done to Pierpont's and Epifanio's credibility? Again, we must consider the cumulative impact of all the undisclosed and false evidence. The evidence of the threats, payments, and Mack's coaching of the Tovars to deny the payments, would have damaged Mack's credibility and provided grounds to impeach Lucia. But most importantly, the disclosure of Pierpont's and Mack's willingness to coach important prosecution witnesses to lie—driven home by the fact that Epifanio did perjure himself—would not have just diminished Pierpont's and Mack's credibility. It would have called into question the entire police investigation. As the postconviction court articulated it, these disclosures "would have undermined the integrity of both the police investigators and their investigation generally."

¶153 For these reasons, we agree with the postconviction court that in light of the facts proved in the postconviction proceeding, viewed with the evidence and facts introduced at trial and sentencing, Carter has established that if the *Brady* and *Napue* evidence had been disclosed, "there would be a reasonable likelihood of a more favorable outcome." UTAH CODE § 78B-9-104(2)(a).

## CONCLUSION

¶154 The constitutional violations that took place during Carter's trial and resentencing are serious. It is rare to see a case involving multiple instances of intentional misconduct by two different police officers—one of them the lead investigator on the case—and a prosecutor. But that is what the postconviction court found here. Two officers instructed important prosecution witnesses to lie not only about receiving benefits from the police, but also, in Epifanio's case, to fabricate a statement intended to show that Carter harbored a premeditated intent to commit rape

on the night of the murder. Epifanio went along with the coaching and perjured himself repeatedly. And the prosecutor stood by while Epifanio denied receiving any benefits, knowing the testimony was false, and did nothing to correct it. The postconviction court granted Carter's petition, vacated his conviction and sentence, and ordered a new trial because it determined these violations prejudiced Carter within the meaning of the PCRA. Its "confidence [was] undermined in both Carter's conviction and sentence." So is ours.

¶155 We affirm.

_____