In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1034

JOEL MAYORAL,

Plaintiff-Appellant,

v.

MICHAEL F. SHEAHAN, in his official capacity
as Sheriff of Cook County, and SHARON JACKSON,
WILLIAM JANAK, and DANIEL THEISEN, in his
individual capacity and in his official capacity
as a correction officer at the Cook County Jail,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 7249--Paul E. Plunkett, Judge.

Argued September 29, 2000--Decided March 27, 2001

Before EASTERBROOK, RIPPLE, and EVANS, Circuit
Judges.

EVANS, Circuit Judge.  While Joel Mayoral was a
pretrial detainee at the Cook County jail, he was
attacked by other inmates. His complaint in this
42 U.S.C. sec. 1983 action says the attack
rendered him paralyzed and disfigured. Mayoral's
suit alleges that certain correctional officers
were deliberately indifferent to his welfare and
that Cook County Sheriff Michael F. Sheahan and
Captain David Theisen failed to implement a
policy which would consider gang affiliation in
the housing of inmates at the jail. The district
judge granted summary judgment for the defendants
and Mayoral appeals. We take the facts, in this
fact-intensive case, in the light most favorable
to Mayoral at this stage of the case.

Mayoral, a former member of the Latin Kings
street gang, was arrested for the murder of a
member of the Latin Disciples, a rival gang. At
midnight on November 23, 1994, he was taken to
the Cook County jail, where he told the receiving
officer that he had been a gang member, that his
charged crime involved a rival gang member, that
he feared for his life, and that he needed
protective custody. The officer recorded the

information. But when Mayoral said he was no longer in a gang, the officer became annoyed and scratched over the information on the form.

Mayoral was taken to Division I of the jail, a maximum security division, where he received his prison uniform. He then went to court, and when he returned around 4 p.m. he again told an officer that he needed protective custody. He was taken, however, to a general section of Division I known as Tier B-3 where he was checked in by Officer Sharon Jackson. Mayoral tried to tell her he needed protection, but she said she was busy and rushed him into the tier's day room.

She was, in fact, busier than she should have been. She was "cross-watching" tiers--which means that because the jail was short-staffed she was watching two tiers. She had been working as a correctional officer for a year or so at the time of the incident, and there was deposition testimony that she did not have sufficient experience to be cross-watching two tiers. Also, her radio--a means of summoning help fast--was not working and had not been working for several days.

As soon as he entered the tier, Mayoral was approached by an inmate who asked his gang affiliation. Eventually, Mayoral admitted that he was a former Latin King. Inmates gathered, saying that theirs was a "Folks" deck and they could not have a member of a "People" gang there. When Mayoral tried to make a telephone call to his sister, an inmate came up to him and said he could not use that particular telephone because it was a Folks' phone. He tried to use the other phone; an inmate reached over his shoulder and disconnected the call. On a third attempt, Mayoral managed to speak with his sister for a few minutes before other inmates told him to hang up because it was a Folks' phone.

Mayoral also noticed that the tier reeked of "hooch," a type of prison alcohol. He observed inmates drinking an orange substance that he believed to be hooch. Hooch, apparently, is widely produced by inmates in the Cook County jail and is frequently confiscated in shakedowns at the jail.

Officer Jackson had also observed inmates drinking an orange substance and noted that they were "being very loud." She noted that the inmates appeared to be intoxicated. She notified Sgt. William Janak, who arrived on the scene and locked most of the inmates in their cells. An inmate named Jamie O'Kelly and a few others refused to be locked up. Janak told O'Kelly that if he could not control his guys, the inmates

would have to remain locked up. Janak left the area and told his supervisor that the inmates seemed drunk from hooch.

Janak returned to the tier at about 5:30 and told inmate O'Kelly that he would release the inmates if O'Kelly would promise to control "his guys," which O'Kelly agreed to do. Jackson noted in her logbook that the inmates were released from their cells "per Sgt. Janak." Janak, in turn, says he received permission from his supervisors to end the lockdown. Jail policies require a search of the tier before releasing inmates from a lockdown, but this time no search was conducted.

Dinner was served, and soon Mayoral again tried to call his sister. While he was on the phone, less than an hour after the lockdown ended, a fight broke out. Mayoral tried to reach his cell, but O'Kelly and others backed him into a corner. O'Kelly stabbed him with a weapon (a shank in prison lingo) and others hit him on the head with a mop wringer. Someone also threw a television at Mayoral, hitting him in the head. The beating lasted around 15 minutes. Ultimately, Mayoral was lying unconscious on the floor. It was later determined that he had been stabbed around 16 times.

Jackson stated that inmates were fighting at 6:20. She claims to have immediately called Janak from a telephone, but Janak denies that he spoke with her at that time. At her deposition, Jackson seemed to have forgotten all about the events of November 23 and had to be reminded that an incident took place on her tier on that date. Once reminded, she said that loud noise and profanity are what inspired her to call Sgt. Janak, who in turn called an "all available." On the other hand, Janak says he heard about the riot when he heard an "all available" call at 6:45. He does not know who made the call. Captain Theisen thought it was Officer Leonardo Brown. But Brown said that the first he knew of the riot was when he heard the "all available" call at 6:45 when he was picking up dinner trays on another tier. When Theisen arrived at Tier B-3, one inmate, presumably Mayoral, was already unconscious on the floor. Officers who responded to the call described what they saw when they arrived at Tier B as a "gang riot" involving numerous inmates, some of whom were intoxicated. Contrary to the time period involved here before help arrived, it ordinarily takes only around 4 minutes for additional officers to respond to an "all available" call.

Captain Theisen estimates that over 80 percent of inmates in Division I in 1994 were gang

members, with about 60 percent of these affiliated with the Disciples, the Vice Lords, or the Latin Kings. The gangs are divided into two umbrella organizations known as "People" and "Folks." Gang-related violence is fairly common, occurring as often as once or twice a week in Division I. Not surprisingly, "Folks" do not like "People," such as Mayoral, who kill "Folks." Despite what seems to be general knowledge of gangs in the jail, Officer Jackson testified at her deposition that she did not know anything about gang affiliations of inmates, that she would not know a gang sign or gang colors if she saw them. She claimed not to be aware of any gang-related violence at the jail, and she said that no inmate ever asked her for protection because he was a member of a gang:

Q Are you familiar with what inmates belong to what gangs?
A No.
Q Do you ever see any inmates flashing gang signs?
A No. I don't--I don't--No.
Q Would you know a gang sign if you saw one?
A No.
Q Would you know gang colors if you saw them?
A No.
Q Are you aware of any gang-related violence at the jail?
A Hearsay.
Q Have you ever observed any gang-related violence?
A No.

She acknowledged that she had heard the names of gangs on television:
Q You don't know the names of any gangs?
A I've heard them like on TV.

Captain Theisen testified that it would be likely that within the time that Mayoral had been booked into the jail until the assault, other inmates would be able to gain knowledge of the nature of the crime with which he was charged.

The Cook County Department of Corrections (CCDOC) has no policies regarding separating rival gang members, even in cases where the crime for which an inmate is incarcerated is the murder of a rival gang member. Lieutenant Isaac Chatman testified that protective custody is not automatically offered to an inmate who has killed a rival gang member: "He's the one that did whatever he did." When asked whether he thought that would put him at risk, Chatman said, "He's the one who is charged with the crime."

Mayoral's case was resolved in the district court on summary judgment. Accordingly, our review is de novo. Summary judgment may be

granted only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. We construe the facts and inferences in the light favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The issue here is whether, based on the facts in the record and the inferences which can be drawn from those facts, Jackson, Janak, and Theisen, as a matter of law, were not deliberately indifferent to Mayoral's health and safety and that the lack of a policy was likewise not the result of deliberate indifference to inmate safety.

Mayoral is a pretrial detainee whose claim arises under the Fourteenth Amendment's Due Process Clause rather than directly under the Eighth Amendment, but as we said in Weiss v. Cooley, ___ F.3d ___, 2000 WL 1367988 (7th Cir. 2000), there is "little practical difference between the two standards." See Tesch v. County of Green Lake, 157 F.3d at 473-74 (7th Cir. 1998); Henderson v. Sheahan, 196 F.3d 839 (7th Cir. 1999), cert. denied, 120 S. Ct. 2691 (2000). The Eighth Amendment protects against the infliction of "cruel and unusual punishment." Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners. Langston v. Peters, 100 F.3d 1235 (7th Cir. 1996).

The standard against which official conduct is measured is the deliberate indifference standard set out in Farmer v. Brennan, 511 U.S. 825 (1994). A plaintiff cannot establish a violation of the Eighth or Fourteenth Amendment by a showing that the officials were negligent, but neither must a plaintiff show that the officials acted with the purpose of causing him harm. Rather,

a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 837. A plaintiff must show both an objective risk of danger and that the defendants had actual knowledge of the risk. Henderson, at 844-45. The facts are "subject to demonstration in the usual ways . . . ." Farmer, at 842. The determination as to whether there was an Eighth Amendment violation can rest on inferences properly drawn from the facts in the record:

Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

Furthermore, if a plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding and pervasive or noted by prison officials in the past, and a defendant has been exposed to information regarding the risk, then the evidence could be sufficient to permit a trier of fact to find that the official in fact had actual knowledge. It is not necessary that the official desire the harm to befall an inmate.

Farmer also tells us how specific the knowledge of the risk must be. The official cannot escape liability by showing that he did not know that a plaintiff was especially likely to be assaulted by the specific prisoner who eventually committed the assault. It does not matter whether the risk comes from multiple sources or from one source, and it does not matter whether the prisoner is at risk for reasons personal to him or because all the prisoners face the risk. Referring to Hutto v. Finney, 437 U.S. 678, 681-82 n.3 (1978), the Court said that if rape were so common that "some potential victims dared not sleep [but] instead . . . would leave their beds and spend the night clinging to the bars nearest the guards' station," it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom. Farmer, at 843-44, quoting Hutto at 681-82. See also Haley v. Gross, 86 F.3d 630 (7th Cir. 1996); Pavlick v. Mifflin, 90 F.3d 205 (7th Cir. 1996).

Mayoral's claims against Sheriff Sheahan and Captain Theisen are that in their official capacities they showed deliberate indifference by their failure to implement a policy which took into account gang-related risks to inmate safety when deciding where to house inmates within the jail. Mayoral grounds his argument on our decision in Walsh v. Mellas, 837 F.2d 789 (7th Cir. 1988).

In Walsh we held that the failure of officials at Stateville Correctional Center to screen inmates being assigned to special housing units to ascertain gang-related activities could violate the Eighth Amendment. Walsh was a person known to be targeted by a gang. He had asked for protective custody; then he deliberately committed an infraction of prison rules in order to be placed in disciplinary cells, apparently thinking those were safer than protective

custody. That seemed to be a good plan until the prison placed a member of the gang in the cell with him. That situation differs from the one before us, and we decline to extend Walsh to the present situation.

The number of gang members housed by the CCDOC and the high representation of certain gangs would place an unmanageable burden on prison administrators were they required to separate inmates by gangs. Would the jail be required to have a tier for Gangster Disciples, a tier for Latin Kings, etc.? We were told at argument that there is currently pending a lawsuit to prevent that sort of a housing pattern on the basis that it would, in effect, become a racial separation of inmates. Whether that case presently exists or not, were the CCDOC to separate inmates by gang affiliation, and thus effectively by race, it would only be a matter of time before a lawsuit would be filed. Plus, it would be an unmanageable practical burden to manage the jail population. What would happen if there were too many Disciples for a tier and too few Latin Kings. It is a situation such as this one which causes us to recognize again the wisdom set out in Bell v. Wolfish, 441 U.S. 520, 547 (1979):

[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

The claims against Officer Jackson, Sergeant Janak, and Captain Theisen in their individual capacities, however, present a somewhat different situation. Given that the jail does not separate gangs, and given that gang-related problems happen once or twice a week, was it clear as a matter of law that these officers were not deliberately indifferent to a known substantial risk of harm, so that they were entitled to summary judgment in their favor?

When we combine the Farmer standard with the standard for granting summary judgment, we conclude that when the inferences are drawn favorably to Mayoral, summary judgment was improperly granted to Jackson and Janak. As to Captain Theisen, there is insufficient evidence to raise an inference that he either had knowledge of the risk or was deliberately indifferent to a risk. He was properly dismissed.

As to Jackson and Janak, Mayoral has raised

issues of fact which preclude a quick end to the case on summary judgment. That there was a situation which posed a significant risk of harm to inmates was clear to the two officers. Mayoral testified at his deposition that he notified Jackson that he needed protective custody and she brushed him off. In the afternoon, Jackson noted that the inmates were rowdy and seemed to be intoxicated. She noticed them drinking an orange substance. She was concerned enough to notify Sgt. Janak, who locked most of the inmates in their cells. When they were let out of their cells, they continued to be loud. One could draw an inference that Jackson was aware of a significant risk to inmates in Tier B-3, and to Mayoral specifically. Add to this her testimony at her deposition that she was not aware of gang activity in the jail. Given the pervasive presence of gangs, a jury could be justified in finding testimony like hers incredible and deliberately ignorant. The Farmer standard is not designed to give officials the motivation to "take refuge" in the zone between ignorance and actual knowledge. Jackson, assuming again that Mayoral's view of the facts is correct, could be seen by a responsible trier of fact as trying to inhabit that zone.

In addition, Jackson testified at her deposition that the riot in which Mayoral was injured broke out at 6:20. She says she notified Janak at that time. Janak denied that he was on the telephone with her and claims not to have heard about the riot until he heard an "all available" call at 6:45. At the very least, these discrepancies raise questions about whether there was a delay in summoning help.

For his part, Sgt. Janak knew some inmates were drunk. He was sufficiently aware of trouble on the tier to obtain authority to lock down the inmates. Or at least most of the inmates. O'Kelly and others refused to be locked down. That some inmates were drunk and sufficiently powerful to refuse to obey Janak's order raises more than an inference that there was a risk of significant harm on this tier. Furthermore, before Janak released the inmates he told inmate O'Kelly to control "his guys." Janak (again, assuming the truth of Mayoral's view of the case) seems to have deliberately abdicated his responsibility and put the fate of the inmates in the hands of another inmate. We hope that is not common practice; to say the least, it seems unwise and could be seen as a sign of deliberate indifference to what happens. It is obvious that O'Kelly was not interested in keeping the peace; he, it is claimed, was the one who stabbed Mayoral. Perhaps he was controlling the troops, but not for peaceful purposes. It is impossible

to say as a matter of law that one who leaves such a volatile situation under the control of an inmate is not deliberately indifferent to inmate health and safety. It is a question for a jury to decide.

Accordingly, the judgment is AFFIRMED IN PART and REVERSED IN PART. The claims against Jackson and Janak are REMANDED to the district court for further proceedings.

RIPPLE, Circuit Judge, concurring in part and dissenting in part. I agree that the grant of summary judgment to Sergeant Janak and Officer Jackson in their individual capacities must be reversed.

In my view, the claim against Captain Theisen in his individual capacity ought to survive summary judgment. Captain Theisen was the shift commander. During his watch, one of his subordinate officers, Sergeant Janak, had to go, with his hat in his hand, to an inmate gang leader and plead for the end of a violent episode by drunken inmates. Captain Theisen had operational responsibility for the situation, but the prison gangs had operational control. Management was not managing; it had surrendered its responsibilities to the inmates. Under these circumstances, a jury could determine that the shift commander could have remained unaware of the deplorable state of jail security only by conscious avoidance/1 of the knowledge or by reckless indifference.

The claim against Sheriff Sheahan also must survive summary judgment. I cannot join my colleagues' characterization of this claim as seeking to impose a rigid, constitutionally imposed duty on the Sheriff to structure living arrangements so that inmates of different gang affiliations are kept completely separate. The plaintiff simply contends that gang affiliation ought to be a screening factor at the divisional level so that it is a factor in placement. On this record, a trier of fact certainly could conclude that the Sheriff took no adequate measures to protect inmates from gang violence in the jail. Given the extent of gang control of this facility, the trier of fact certainly could determine that even those at the highest level of responsibility could only have remained unaware of such a deplorable state of jail security by conscious avoidance of the knowledge or by reckless indifference.

/1 See Farmer v. Brennan, 511 U.S. 825, 843 n.8 (1994); Higgins v. Correctional Med. Servs. of Illinois, Inc., 178 F.3d 508, 511 (7th Cir. 1999); West v. Waymire, 114 F.3d 646, 651 (7th Cir. 1997).