[Cite as *Evans v. McGuffey*, 2025-Ohio-5205.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| EL-HAJJ EVANS, | : | CASE NO. | C-250475 |
| Petitioner, | : | | |
| vs. | : | *JUDGMENT ENTRY* | |
| CHARMAINE MCGUFFEY, HAMILTON COUNTY SHERIFF, | : | | |
| | : | | |
| Respondent. | : | | |
| | : | | |

This cause was heard upon the petition for a writ of habeas corpus, the response, and the evidence filed by the parties.

For the reasons set forth in the Opinion filed this date, the petition for a writ of habeas corpus is granted. The court orders that the petitioner be admitted to bail upon signing a recognizance in the amount of $750,000, to be secured by a surety bond, a bond secured by real estate or securities as allowed by law, or a deposit of cash equal to the full amount owed. As conditions of the recognizance, the petitioner shall be required to submit to an electronic monitoring device ("EMD") and Juris Monitoring during the period of any pretrial release.

Further, the court orders that costs be taxed under Civ.R. 54(D).

The court further orders that the clerk serve notice of the judgment upon all parties as required by Civ.R. 58(B).

**To the clerk:**
**Enter upon the journal of the court on 11/19/2025 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *Evans v. McGuffey*, 2025-Ohio-5205.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| EL-HAJJ EVANS, | : | CASE NO. | C-250475 |
| Petitioner, | : | | |
| vs. | : | *O P I N I O N* | |
| CHARMAINE MCGUFFEY, HAMILTON COUNTY SHERIFF, | : | | |
| | : | | |
| Respondent. | : | | |
| | : | | |

Original Action in Habeas Corpus

Judgment of the Court Is: Writ Granted

Date of Judgment Entry on Appeal: November 19, 2025

*Arenstein & Gallagher* and *William R. Gallagher*, for Petitioner,

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.,* Assistant Prosecuting Attorney, for Respondent.

**CROUSE, Judge.**

{¶1} This is an original action for a writ of habeas corpus. Petitioner El-Hajj Evans is currently detained without bail pending his trial pursuant to an order from the court of common pleas. Evans contends that, after his bail-denial hearing and appeal, he obtained evidence that the State's primary witness at his hearing, a law-enforcement officer, made false statements of fact while on the stand. The trial court, however, denied Evans's motion to reopen his bail-denial hearing. He now petitions this court for a writ of habeas corpus, arguing that his continued detention without bail deprives him of his liberty without due process of law.

{¶2} After reviewing the evidence, we conclude that Evans is entitled to the writ. Due process prohibits the State from using false testimony to deprive any person of their liberty. As we explain below, the State employed false testimony at Evans's no-bail hearing, and that false testimony could have altered the trial court's determinations that Evans "pose[d] a substantial risk of serious physical harm" to others and "that no release conditions [would] reasonably assure the[ir] safety." *See* R.C. 2937.222(B). Evans's continued detention is therefore unconstitutional. And because Evans lacks an adequate remedy at law to challenge his unlawful confinement, we grant his petition, issue a writ of habeas corpus to respondent Hamilton County Sheriff Charmaine McGuffey, and order Evans admitted to bail.

## I. BACKGROUND

{¶3} While the legal issues in this case are sharply contested, the facts at the core of the parties' procedural and constitutional dispute are largely uncontested.

### A. *Arrest & Bail-Denial Hearing*

{¶4} Evans was involved in an altercation with D.P., which ended when Evans shot and killed D.P. Evans asserted, both on the day of the killing and in the

trial court, that he acted in self-defense. He was charged with the murder and his bail was set at $750,000.[1] When Evans moved to reduce his bail, the State moved to hold him without bail pursuant to R.C. 2937.222. As required by statute, the trial court held a hearing on the motion to deny bail. The State's primary witness was Cincinnati Police Department ("CPD") Homicide Detective Delicia Grisby.

{¶5} Detective Grisby testified that, around 4:00 a.m. on the morning of June 15, 2024, CPD officers reported to 1130 Wilmont Court, an address in a residential area of College Hill in Cincinnati. Officers had received "several calls about a large fight, and then a call . . . about a shooting." CPD officers located D.P., already dead, on the floor of the living room in 1130 Wilmont Court. When Detective Grisby arrived, she saw eight to nine shell casings and a trail of blood that led from the street to 1130's living room.

{¶6} Detective Grisby and other officers spoke with witnesses on the scene to try and ascertain who had shot D.P. Their "investigation revealed that Elhajj Evans," who was not on the scene at the time, "was the shooter."[2] Detective Grisby testified that "it was described by several witnesses on both sides of the incident, from Elhajj Evans's party and also [D.P.]'s party, that Elhajj Evans arrived there in a silver SUV," of which he was the driver; that Evans "drove into the street pretty quickly" at a "pretty fast pace"; and that this "started the chain of events that led to the homicide." "It was reported," Detective Grisby testified, "that upon Elhajj Evans's arrival, he immediately got out of the vehicle, and there was a series of fights between his self [sic] and [D.P.] that started almost immediate [sic]." The two apparently engaged in a series of

---

[1] The case number of the relevant proceeding against Evans in the Hamilton County Court of Common Pleas is No. B-2403059.

[2] The transcript of proceedings consistently spells Evans's first name as "Elhajj," rather than "El-Hajj," as Evans spells it in his brief. We have preserved the spelling as it appears in the transcript.

4

fistfights, but they were repeatedly separated by onlookers.

{¶7} Detective Grisby said that witnesses "described that you could see the butt of a gun sticking out of [Evans's] pocket upon his arrival." She also testified that, in a video recording of part of the encounter, D.P. can be heard telling Evans to "[p]ut the gun away." (The State has not made this video part of the record in either this proceeding or the bail-denial proceedings before the court of common pleas.) No part of the recording apparently showed the gun in Evans's hands. According to Detective Grisby, as Evans approaches D.P. and D.P. tells him to put the gun away, Evans's hands can be seen "balled up" in fists, not clutching a weapon. Detective Grisby could not recall if she had seen a gun in Evans's waistband or pocket on the video.

{¶8} When asked by the prosecuting attorney whether it was "ever alleged that our victim [D.P.] had a weapon, a gun, at any time," Detective Grisby responded, "No, it was not."

{¶9} Detective Grisby also testified that "[b]ased on [CPD's] investigation, [D.P.] obtained [a] crowbar because Mr. Elhajj Evans was armed with a firearm." However, "someone reported that they took the crowbar" from D.P. "and threw it" prior to the shooting.

{¶10} According to Detective Grisby's recollection of the witness's statements, when a "third round of fighting ceased," D.P. began spitting on Evans and yelling "'Herpes spit, Herpes spit.'" Evans allegedly replied, "'If you spit on me again, I'm going to shoot you.'" When D.P. spat on him once more, Evans shot at and struck him. D.P. and the crowd began to flee, before a second burst of shots. In addition to D.P., one other victim was hit but survived. Detective Grisby testified that the eight or nine shell casings at the scene were fired from the same weapon.

{¶11} Detective Grisby's testimony painted Evans as the moving force in the

confrontation. In response to questioning from defense counsel, she testified that she was "not told by anybody that there was an issue with [D.P.] coming after other people" during the night in question.

**{¶12}** Although Evans had left the scene shortly after the shooting, he returned some time after police arrived. He "presented himself as the shooter" and turned over his weapon, at which point officers took him into custody. Evans told police that he had "left the area because he did not feel safe," but had returned after the police had arrived—perhaps "at the advisement of his mother and his father." Evans asserted that he had acted in self-defense and requested to speak to an attorney. The police did not arrest Evans at that time.

**{¶13}** When Evans's attorney was subsequently informed that the State intended to charge him, Evans voluntarily surrendered himself to police and submitted to arrest.

**{¶14}** A second witness at the hearing, who said she was D.P.'s "best friend," testified that D.P.'s family "fe[lt] like he was killed in cold blood, period," and said that Evans "could have just left it at you-all fighting" and "didn't have to shoot and kill [D.P.]." She said that D.P.'s family and potential witnesses were frightened of "what [Evans] would be capable of doing," but cited no incidents of threats or intimidation or other bases for such a fear. She testified that she had no knowledge of Evans prior to the shooting and did not testify that she witnessed the shooting.

### B. After the Hearing

**{¶15}** Following the hearing, the trial court granted the State's motion and ordered Evans detained without bail pending trial. Because that order of detention was a final appealable order under R.C. 2937.222(D)(1), Evans appealed it, and we affirmed. *State v. Evans*, 2024 Ohio App. LEXIS 4355 (1st Dist. Dec. 4, 2024) ("*Evans*

*I*").

{¶**16**} Evans later sought to reopen the bail-denial hearing under R.C. 2937.222(A), asserting that he had received evidence in discovery that contradicted certain portions of Detective Grisby's original testimony. The trial court denied his motion to reopen. When Evans sought to appeal the denial, we dismissed it, holding that a trial court's "denial of a motion to reopen" is not "itself an 'order . . . denying bail' within the meaning of R.C. 2937.222(D)(1)," and therefore not a final appealable order. *See* Entry of Dismissal, *State v. Evans*, No. C-250152, at 1-2 (1st Dist. May 2, 2025) ("*Evans II*"). In so doing, we noted that, "[u]nlike a petition for a writ of habeas corpus—in which a detainee, lacking an adequate remedy in the ordinary course of law, may challenge the continued legality of the pretrial detention itself—a direct appeal requires a final appealable order from the trial court, which this court then reviews." *Id.* at 2, citing *State ex rel. Wesley v. Cuyahoga Cty. Court of Common Pleas*, 2021-Ohio-3489, ¶ 11, and *State ex rel. Garcia v. Baldwin*, 2023-Ohio-1636, ¶ 26 and 30.

{¶**17**} Evans then initiated this original action by filing a petition in this court for a writ of habeas corpus to the sheriff. The sheriff responded, and this court issued an order instructing the parties to file any "further evidence with respect to any issue made by the petition and response" and to set forth any reason why this court should not determine the merits of Evans's petition on the papers and evidence so submitted. Evans rested on the evidence attached to his petition, which included transcripts of the bail-denial and other hearings in his criminal case, as well as clips from recorded video interviews conducted by Detective Grisby. The State submitted the complete recordings of those interviews under seal.

## II. HABEAS JURISDICTION

{¶18} "Whoever is unlawfully restrained of his liberty . . . may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment, restraint, or deprivation." R.C. 2725.01. Ohio's courts of appeals have original jurisdiction to grant such writs pursuant to Ohio Const., art. IV, § 3(B)(1)(c).

{¶19} By a writ of habeas corpus, the court brings before it not the final judgment or record of another court, but the "corpus" (i.e., the body) of the prisoner himself, along with the cause of his caption and detention. *See* R.C. 2725.12; *Hartranft v. Mullowny*, 247 U.S. 295, 301 (1918), quoting 2 Hale, *History of the Pleas of the Crown*, 210-211 (1736) (noting how, just as "'the certiorari alone removes not the body, so the habeas corpus alone removes not the record itself, but only the prisoner, with the cause of his commitment'"); *see also Steiner v. Fell*, 1 U.S. (1 Dall.) 22, 22 (Penn. 1776) ("The proceedings, on a *Habeas Corpus* are *de novo;* on a *certiorari*, the court proceed on the state returned."). Once the prisoner's body is before the court, the court has three options for its disposition: (1) discharge the prisoner from custody, (2) let the prisoner to bail, or (3) remand the prisoner to his jailer. If, after examining "the cause of caption and detention," the habeas court is "satisfied that [the petitioner] is unlawfully imprisoned or detained," then the court "shall forthwith discharge such person from confinement." R.C. 2725.17. If the habeas court determines the petitioner is detained pending his trial "on a charge of having committed a crime or offense which is bailable," then it "may recommit him or let him to bail." R.C. 2725.18. And if the court determines the petitioner is lawfully detained and is not bailable, then the court will remand the prisoner back to the custody of his jailer.

{¶20} When the papers alone make clear that a prisoner's custody is authorized such that remand would be the proper disposition, a court should decline

to issue the writ, rather than bringing the prisoner before it only to remand him. *See* R.C. 2725.05.

**{¶21}** The Ohio Supreme Court has held that a "petition for a writ of habeas corpus is the proper cause of action for a person seeking to challenge the unlawful restraint of his liberty due to excessive bail or the complete denial of bail." *Wesley*, 2021-Ohio-3489, at ¶ 11; *accord Small v. Hooks*, 2017-Ohio-8724, ¶ 4, citing *State ex rel. Pirman v. Money*, 69 Ohio St.3d 591, 594 (1994) (habeas corpus will lie for unlawful denial of bail pending appeal).

**{¶22}** Of course, "[r]elief in habeas corpus does not lie when the petitioner has an adequate remedy in the ordinary course of the law." *Garcia*, 2023-Ohio-1636, at ¶ 26, citing *Steele v. Harris*, 2020-Ohio-5480, ¶ 13. For example, habeas corpus will not generally lie for a pretrial detainee held without bail pursuant to R.C. 2937.222, because such a prisoner has an adequate remedy at law, in the form of a direct appeal from the order denying him bail under R.C. 2937.222(D)(1). *Garcia* at ¶ 26 and 30.

**{¶23}** But the allegations in this case are different. Evans has obtained new evidence that he claims undermines his original bail-denial order. Specifically, he contends that Detective Grisby—a state actor and the sole witness who testified about the shooting at his bail-denial hearing—lied on the stand, thereby tainting his bail-denial hearing and depriving him of his liberty without due process of law. Evans alleges that he was unaware of the evidence that proved the falsity of Detective Grisby's statements at the time of his original hearing. Upon being made aware of that evidence, he applied to reopen the bail-denial hearing under R.C. 2937.222(A) but was denied. In essence, Evans alleges that, in light of this new evidence, his continued detention under his original bail-denial order is unlawful, and that the trial court has stymied his attempts to seek relief in the ordinary course of the law.

**{¶24}** Habeas is the proper vehicle for such a claim. The availability of appeal under R.C. 2937.222(D)(1) is the only reason the writ has generally ceased to be available to individuals held without bail on first- or second-degree-felony charges. *See Garcia* at ¶ 29 (noting that the petitioner in *Wesley* had been entitled to habeas corpus because he "was not charged with a first- or second-degree felony, bringing him outside the purview of R.C. 2937.222"); *McCarry v. Neal*, 2015-Ohio-3155, ¶ 4-5 (1st Dist.) (Fischer, J.) (dismissing habeas petition solely because "R.C. 2937.222(D)(1) provides an offender challenging a trial court's denial of bond with an adequate remedy at law by way of an appeal"); *State v. Murray*, 2022-Ohio-3411, ¶ 14, 16 (1st Dist.). But Evans now alleges that he was not afforded due process at his first hearing. And because the trial court's denial of his motion to reopen is not appealable, Evans is left with "no adequate legal remedy, e.g., appeal or postconviction relief," *Pirman*, 69 Ohio St.3d at 593, by which to seek review of his allegedly unconstitutional detention in light of the new evidence.

**{¶25}** In "extraordinary circumstances where there is an unlawful restraint of a person's liberty, habeas corpus will lie notwithstanding the fact that only nonjurisdictional issues are involved, but only where there is no adequate legal remedy, e.g., appeal or postconviction relief." *Id*. This case involves such circumstances. We therefore hold that Evans may seek habeas corpus to challenge the legality of his continued detention without bail. *Compare Atkins v. Michigan*, 644 F.2d 543, 549-550 (6th Cir. 1981) (holding that federal habeas will lie for state pretrial detainees held without due process, provided state remedies have been exhausted). Accordingly, this court has original jurisdiction to hear Evans's petition under Ohio Const., art. IV, § 3, and R.C. 2725.01.

### III. DUE PROCESS

**{¶26}** Evans's principal contention is that the new evidence demonstrates that he was deprived of his liberty—in this case, his right to bail—without due process of law. Specifically, he alleges that the prosecution's use of false or perjured testimony at his no-bail hearing violated the Fourteenth Amendment.

**{¶27}** We start from a basic precept of constitutional criminal procedure: the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972), quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). *Napue v. Illinois*, 360 U.S. 264, 269 (1959), long ago established that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." To establish a *Napue* violation in the context of a criminal trial, a defendant must first show "that the prosecution knowingly solicited false testimony or knowingly allowed it to go uncorrected when it appeared." (Cleaned up.) *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025). If so, then the defendant will be entitled to a new trial, "so long as the false testimony may have had an effect on the outcome of the trial—that is, if it in any reasonable likelihood could have affected the judgment of the jury." (Cleaned up.) *Id.*; *accord Giglio* at 154.

**{¶28}** The threshold question in this case, then, is whether the Due Process Clause provides similar protection against the use of perjured testimony to deny a defendant bail. Both common sense and the cases suggest that the Due Process Clause offers such protection.

**{¶29}** Although the issue is not frequently litigated, a few courts have affirmed the State's constitutional obligation not to knowingly use false testimony or fabricated evidence to deprive a defendant of his liberty prior to trial. For example, when

confronted with an allegation that officers had secured an indictment by providing fabricated evidence, the Second Circuit has held that "[i]t is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer." *Zahrey v. Coffey*, 221 F.3d 342, 346, 355 (2d Cir. 2000). This was so, even though the allegedly fabricated evidence never secured Mr. Zahrey's conviction, as he was acquitted by a jury of his peers. *Id. See also Frost v. New York City Police Dept.*, 980 F.3d 231, 248 (2d Cir. 2020); *Barnes v. City of New York*, 68 F.4th 123, 129-131 (2d Cir. 2023).

**{¶30}** The Seventh Circuit has similarly "held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). Working from this rule, multiple federal district courts in that circuit have found due-process violations, even where the defendant is ultimately acquitted. For example, the district court in *Myvett v. Heerdt*, 232 F.Supp.3d 1005, 1023 (N.D.Ill. 2017), applying *Whitlock*, upheld a civil jury verdict against a police detective on a due-process claim where "a reasonable juror could have found that [the detective's] fabricated witness statements caused Myvett to endure thirteen months of pretrial detention."

**{¶31}** Common sense supports these conclusions. Just as the Constitution prohibits a conviction based on known false evidence, *see Napue*, 360 U.S. at 269, and prohibits the fruits of a search warrant based on a false affidavit, *see Franks v. Delaware*, 438 U.S. 154 (1978), so, too, it prohibits pretrial detention that rests upon false testimony of a state official.

**{¶32}** Accordingly, we hold that the Due Process Clause prohibits the State's use of knowingly false or fabricated testimony to deprive a criminal defendant of his

liberty pretrial, including at a pretrial bail-denial hearing.

**{¶33}** *Napue* establishes the basic framework for addressing such a claim. Evans must therefore show that (1) false testimony was admitted at the bail-denial hearing, (2) the State knowingly solicited that testimony or knowingly allowed it to go uncorrected, and (3) the false testimony could have, in any reasonable likelihood, contributed to the trial court's decision to hold the defendant without bail.

**{¶34}** We consider each of these three elements in turn.

### *A. Falsity*

**{¶35}** Falsity is a straightforward question of fact: did the State's witness offer testimony that was provably untrue? Evans points to several allegedly false statements in Detective Grisby's testimony at the bail-denial hearing. The evidence clearly shows that at least two statements were untrue.

### *1. D.P.'s Threatening Conduct*

**{¶36}** On cross-examination, defense counsel asked Detective Grisby whether she had been told that D.P. acted violently toward others the night of the shooting. Detective Grisby testified that she had not:

> COUNSEL: . . . So you spoke to Angela Foxx?
>
> DET. GRISBY: I did.
>
> COUNSEL: And you spoke to Kaylah Marco?
>
> DET. GRISBY: Kaylah Morris.
>
> COUNSEL: Morris; I'm sorry. Okay. And Shamika?
>
> DET. GRISBY: Yes.
>
> COUNSEL: And you were informed, were you not, that there had been at least some incidents where [D.P.] had been acting violent towards others before this shooting had occurred?

13

. . .

DET. GRISBY:    Towards others?

COUNSEL:    Yes.

DET. GRISBY:    Are you talking about that night—

COUNSEL:    Yeah.

DET. GRISBY:    —or in his past?

COUNSEL:    His past is his past, but I'm talking about that night. That night.

DET. GRISBY:    No, I wasn't informed of that prior to their arrival.

COUNSEL:    So you would have been told not by anybody that there was an issue with [D.P.] coming after other people?

DET. GRISBY:    That night, no.

COUNSEL:    Okay. Leading up to that night?

DET. GRISBY:    Prior to that night—

COUNSEL:    Yeah.

DET. GRISBY:    —there was an incident. Are you referring to his relationship with Kaylah Morris?

COUNSEL:    Yeah.

DET. GRISBY:    There were criminal charges that was filed previous with them, between those two; Kaylah Morris and [D.P.].

COUNSEL:    With [D.P.] being violent towards Kaylah Morris.

DET. GRISBY:     Yes.[3]

The obvious import of this exchange was that no one—including and especially Angela Foxx, Kaylah Morris, and "Shamika"—had told Detective Grisby of any "issue with [D.P.] coming after" individuals other than Evans on the night of the shooting.

{¶37}   This was false. Both Foxx and Morris had described being pursued, assaulted, or threatened by D.P. during their interviews with police. Morris told Detectives Green and Grisby that, during the fighting, D.P. had repeatedly approached, attacked, and threatened her:

MORRIS:             . . . So, they fight and they stop fighting. And every time he stopped fighting, like El [i.e., Evans] stop trying to fight him, he'd [i.e., D.P.] come over and like choke me or fight me like to make El like like trying to get him to keep fighting 'em like.

DET. GREEN:     Mm-hm.

MORRIS:             Like he pulled me out of the car like, I don't know if it was a phone or what he had in his hand, but he was like "I kill this bitch right now," like he had me in a headlock, like whatever he had on the back of my neck, like, "I kill her, I kill her," and he drug me out the car. Then they got to fighting again. He grabbed me by my neck again, he end up grabbing me by my neck again, like he had me in a headlock by the car, and when he let me go, he pushed me. So that's when I ran around the car, and that's when I just start hearing [unintelligible] gunshots.

---

[3] All exchanges from police interviews quoted in this opinion occur in both the video exhibits attached to Evans's petition and in the full-length interview videos submitted under seal by the sheriff.

{¶38} Later in the same interview, in an exchange with Detective Grisby, Morris stated that D.P. had acted confrontational toward her from the start of the encounter and had attacked her to provoke Evans:

> DET. GRISBY: And then you said—you were talkin' about, uhm, when [D.P.] was choking you [unintelligible], and you said that, uhm, El pushed you onto a car. What car did he push you on?
>
> MORRIS: No, El ain't push me; [D.P.] push me. It was like [D.P.] was like, trying to get El to fight him, like—
>
> DET. GRISBY: Okay.
>
> MORRIS: You know what I mean? Because, El was like, "Don't put your hands on her!" Like, and he kept doin' it like. So, like, when he got, like, I guess when he got the satisfaction he wanted—the rise out of El—he, like, pushed me to the car.
>
> DET. GRISBY: Oh, so, okay. So he choking you and then he see El reacting—
>
> MORRIS: Mmhmm.
>
> DET. GRISBY: —so he throw you out the way so he—
>
> MORRIS: Yeah, so he—him and El can have—
>
> DET. GRISBY: Okay, so he jump off the porch "You my bitch, you my bitch" running towards you right?
>
> MORRIS: Yeah.

{¶39} Angela Foxx, another witness, relayed a similar story to Detective Green in an interview at which Detective Grisby was present:

> FOXX: . . . So, uhm, don't really know what—who initiated, who started—was it Kaylah and [D.P.]—was it El? And like, I

don't know. All I know is [D.P.] kept trying to chase her around the car. He kept trying to—at one point he had her in a chokehold. I grabbed him at one point and let it go. He started threatening me. And really, he just kept trying to get to her. He kept trying to get to her . . . .

And again, later in that same interview:

> FOXX: I don't know, initially, how everything started, because I was in the car. And I didn't get out till Kaylah got out. And then, when she got out, he kept trying to attack her. [Unintelligible.] I stayed out of it as much as I could. But when he grabbed her by her neck and put her in a chokehold I was standing right here. So I'm grabbing this arm of his like, "Let her go," you know—
>
> DET. GREEN: Mmhmm.
>
> FOXX: —like, "Let her go. You a dude, like, nobody's about to do this." And then he get the—he let her go, but he started threatening me.

**{¶40}** These police interviews, both of which Detective Grisby was present for, contradict her testimony. At the hearing, Detective Grisby was asked whether she had been told "by anybody that there was an issue with [D.P.] coming after other people" that night. At that point in the hearing, the only person Detective Grisby had said D.P. had gone after was Evans. The interview videos clearly show that Morris and Foxx told Detective Grisby that D.P. had "come after" them prior to shots being fired. The true answer to counsel's question was therefore, "Yes." But on the stand, Detective Grisby answered, "That night, no."

**{¶41}** The sheriff contends that "no colorable argument can be made that Detective Grisby's recounting was actually *a lie* without completely crediting Ms.

Morris['s] and Ms. Foxx's statements to CPD as the truth and discounting everything else that Detective Grisby and her fellow investigators were told by other witnesses." But this ignores what Detective Grisby was actually *asked*. Detective Grisby was asked whether she was "*informed*" of any "incidents where [D.P.] had been acting violent towards others" that night, and whether she "would have *been told . . . by anybody* that there was an issue with [D.P.] coming after other people." When she answered, "That night, no," Detective Grisby was testifying that she *was not told* of any such incidents. This was a false statement of fact; at least two witnesses *had told* Detective Grisby that, in addition to attacking Evans, D.P. had repeatedly yelled at and pursued Kaylah Morris and placed Morris in a chokehold that night. Further, Morris had informed the detectives that D.P. had thrown her to the ground, and Foxx had told them that, after D.P. released Morris, he had begun threatening Foxx. The evidence shows Detective Grisby was told these stories, regardless of whether she or the court believed them.

{¶42} Detective Grisby was free to testify that, following her investigation, she concluded that D.P. had not acted violently toward anyone else that night. But when asked whether anyone told her to the contrary, the correct answer was, "Yes, they did." We therefore find that Detective Grisby's testimony stating that no one told her that D.P. had acted violently toward or gone after others that night, was false.

### 2. D.P.'s Gun

{¶43} On direct examination, the prosecuting attorney asked Detective Grisby, "Was any weapon found at, near, *or ever alleged that our victim had a weapon, a gun, at any time*?" Detective Grisby simply replied, "No, it was not." Detective Grisby thus represented to the court that it was *never alleged* that D.P. had a gun.

**{¶44}** This statement is belied by the clear statements of Angela Foxx, who told Detectives Green and Grisby during her interview that, "[D.P.] had a gun. He kept reaching for it, but he never pulled it out. But he had a gun. Instead of going for a gun, he went to his trunk and got a crowbar. He kept swinging it." Thus, at least *one* witness had alleged that D.P. had a gun at the time of the fighting, and Detective Grisby's hearing testimony on this point was false.

**{¶45}** Kaylah Morris was more equivocal on this point, telling the detectives that D.P. "was trying to portray like he had a gun," and that D.P. had told Evans, "I'll shoot this bitch [i.e., Morris] right now." Morris also told the detectives that D.P.'s brother had said, "Put your gun down [D.P.], put your gun down." However, Morris said that she never saw the gun itself and suggested that D.P. may have been using his phone to appear as though he had a gun. Thus, it is at least plausible that Morris did not directly tell Detective Grisby that D.P. had a gun. This, however, would not alter the fact that at least one witness, Foxx, clearly and unambiguously stated that D.P. did.

**{¶46}** We therefore find that Detective Grisby's testimony stating that no one alleged that D.P. had a gun was false.

### 3. Other Statements

**{¶47}** Evans points to several other allegedly false statements. For example, he suggests that Detective Grisby testified falsely when she said that, "[b]ased on [CPD's] investigation, [D.P.] obtained the crowbar because Mr. Elhajj Evans was armed with a firearm." But Evans does not explain what about this statement he thinks was false. Evans does not contest that D.P. obtained a crowbar. Further, Detective Grisby was merely testifying to CPD's conclusion based on the evidence. Even assuming that Evans could show that some witnesses testified to the contrary, this would not prove that Detective Grisby's statements were necessarily false.

19

**{¶48}** Evans also challenges Detective Grisby's statements that "it was reported that upon Elhajj Evans's arrival, he almost immediately got out of the vehicle, and there was a series of fights between his self and [D.P.] that started almost immediately." Again, it is unclear which portion of this testimony Evans believes to be false—perhaps the intimation that Evans provoked the initial conflict or that D.P. did not come for him straightaway. Even assuming that anything in Morris's or Foxx's statements contradicted the version of events Detective Grisby offered at the hearing, this would not render the detective's statements literally false. There is no reason to believe that Detective Grisby was not accurately relaying *someone*'s report of events.

**{¶49}** We therefore find that Evans has not shown that Detective Grisby's other statements listed in his petition were factually untrue. As such, these statements cannot form the basis of his due-process claim.

### B. Knowledge

**{¶50}** The next *Napue* element asks whether the State solicited the false testimony or knew that the testimony was false and failed to correct it.

**{¶51}** We do not know for sure whether the individual prosecutors at the hearing had subjective knowledge that Detective Grisby's statements were false. The prosecutors *did* represent that they had reviewed the entirety of the police file, but not until some six months *after* the bail-denial hearing. Evans produces no other evidence of the prosecutors' individual, subjective knowledge of the content of the Morris and Foxx police interviews on the date of the bail-denial hearing.

**{¶52}** Were Detective Grisby merely a private person, our inquiry might end here. The State cannot violate the Due Process Clause if it does not *know* the testimony it offers is false.

**{¶53}** But Detective Grisby was *not* a private person; she was a law-

enforcement officer charged with investigating Evans's case on behalf of the State. Thus, if Detective Grisby knew her testimony was false, the State knew it was false. This principle, often expressed in terms of imputed knowledge, is black-letter law in the context of the pretrial suppression of materially-exculpatory evidence. Due process requires disclosure of such evidence, even if it is "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

{¶54} Many courts across the country have applied this same principle in the *Napue* context and held that "knowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution" for due-process purposes. *E.g., Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998); *Ex parte Castellano*, 863 S.W.2d 476, 481 (Tex.Crim.App. 1993), citing *Ex parte Adams*, 768 S.W.2d 281, 292 (Tex.Crim.App. 1989).[4] At least one of our sister districts in Ohio has likewise noted

---

[4] *See also, e.g., Wedra v. Thomas*, 671 F.2d 713, 717, fn. 1 (2d Cir. 1982) ("Although the prosecuting attorney had no knowledge of any conversation between [the witness] and the detectives, the knowledge of a police officer may be attributable to the prosecutor if the officer acted as an arm of the prosecution."); *Curran v. Delaware*, 259 F.2d 707, 713 (3d Cir. 1958) (holding that detective's "knowingly false testimony . . . was sufficient to cause the defendant's trial to pass the line of tolerable imperfection and fall into the field of fundamental unfairness," even though prosecution had no actual knowledge of falsity); *Schneider v. Estelle*, 552 F.2d 593, 595 (5th Cir. 1977) (holding that evidence of "intentional falsehood by a state law enforcement officer of a crucial fact" would violate due process and warrant postconviction habeas relief); *Williams v. Griswald*, 743 F.2d 1533, 1542 (11th Cir. 1984) ("It is of no consequence that the facts pointed to may support only knowledge of the police because such knowledge [of perjury] will be imputed to state prosecutors."); *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 379, fn. 10 (2009) ("Should law enforcement officials involved with a criminal prosecution know that a witness for the State testified falsely, that knowledge is imputed to the prosecutor."); *Kulbicki v. State*, 207 Md.App. 412, 444-446 (2012), *rev'd on other grounds* 440 Md. 33 (2014) (expressly holding that, when officers testify falsely, knowledge of falsity may be imputed to the State for *Napue* purposes). *But see, e.g., Smith v. Secy. of New Mexico Dept. of Corr.*, 50 F.3d 801, 830-831 (10th Cir. 1995) (suggesting that information known to police and not disclosed to prosecution cannot be the subject of a *Napue* claim); *Koch v. Puckett*, 907 F.2d 524, 530-531 (5th Cir. 1990) (holding, without discussing *Schneider*, that even assuming sheriff and investigators lied on the stand, prisoner had failed to state a *Napue* claim, because he had not alleged knowledge by the prosecutors). *But see also Briscoe v. LaHue*, 460 U.S. 325, 326, fn. 1 (1983) (noting that the Court has yet to resolve the issue); *Reis-Campos v. Biter*, 832 F.3d 968, 977, fn. 8 (9th Cir. 2016) (noting split among federal circuits on the question, but declining to resolve the issue); *Carter v. State*, 2025 UT 13, ¶ 86-87 (same); *Widmer v. Okereke*, 2025 U.S. App. LEXIS 12323, *23-24 (6th Cir. May 19, 2025) (declining to "reach this imputation issue because" petitioner failed on materiality prong).

that, "[t]ypically, false testimony or evidence introduced by a law enforcement officer is imputed to the state." *State v. Widmer*, 2013-Ohio-62, ¶ 38 (12th Dist.).

**{¶55}** We hold with those courts who have imputed police knowledge of false testimony to the State—at least in those cases where the witnesses providing false testimony are themselves police officers.[5] This conclusion follows naturally from *Napue*, from *Kyles*, and from the legion of federal decisions recognizing that a police officer denies a defendant due process by fabricating evidence regardless of prosecutorial involvement[6]—indeed, even when that evidence misleads prosecutors into filing charges.[7] We cannot imagine why the Due Process Clause would prohibit these sorts of fabricated and false evidence, but tolerate an officer's false testimony on the stand, simply because its falsity slipped under the prosecutors' radar.

**{¶56}** We therefore adopt the view of courts like the Fourth Circuit and the Texas Court of Criminal Appeals and hold that a state official or police officer, who has

---

[5] We express no opinion on whether this principle would apply, for example, where a private person testifies to something on the stand that is proven false by something the witness previously told police officers, but which those officers never communicated to the prosecutor's office. Such a situation poses somewhat different questions than when law-enforcement officers *themselves* provide testimony they knew or should have known to be false.

[6] *See*, *e.g.*, *Jackson v. Cleveland*, 925 F.3d 793, 815 (6th Cir. 2019), quoting *Gregory v. Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) ("The Due Process Clause of the Fourteenth Amendment is also 'violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury'"); *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004); *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014); *Boyd v. Driver*, 579 F.3d 513 (5th Cir. 2009), quoting *Castellano v. Fragozo*, 245 F.3d 939, 942 (5th Cir. 2003) (holding that prison officers' "'manufacturing of evidence and knowing use of that evidence along with perjured testimony to obtain a wrongful conviction deprives a defendant of his long recognized right to a fair trial secured by the Due Process Clause'"); *Avery v. Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) ("[C]onvictions premised on deliberately falsified evidence will always violate the defendant's right to due process."); *Wilson v. Lawrence Cty.*, 260 F.3d 946, 954-955 (8th Cir. 2001); *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021).

[7] *See*, *e.g.*, *Barnes*, 68 F.4th at 128-132 (2d Cir.) (permitting due-process claim for false statement made by police *to prosecutors*, which led to plaintiff's prosecution); *Black v. Montgomery Cty.*, 835 F.3d 358, 369 (3d Cir. 2016); *Harris v. S. Pines*, 110 F.4th 633, 646-668 (4th Cir. 2024); *Morgan v. Chapman*, 969 F.3d 238, 250 (5th Cir. 2020), quoting *Cole v. Carson*, 802 F.3d 752, 771 (5th Cir. 2015) ("This court recently announced that there is a 'due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person.'"); *Patrick v. Chicago*, 974 F.3d 824, 834-835 (7th Cir. 2020).

investigated a crime on behalf of the State and then testifies about that investigation on the State's behalf, may not make knowingly false representations that result in a deprivation of the defendant's liberty. In such cases, the officer's knowledge that her testimony is false will be imputed to the State for due-process/*Napue* purposes.

{¶57} In this case, Detective Grisby heard and knew about Morris's and Foxx's prior statements. Evans alleges, and the sheriff does not deny, that Detective Grisby was present for and involved in the interviews of Morris and Foxx, both of which occurred prior to the bail-denial hearing. Indeed, Detective Grisby can be seen and, at times, heard on both videos. Thus, to the extent Detective Grisby's statements at the bail-denial hearing were shown to be false by the interview videos, Detective Grisby can be charged with knowledge of their falsity. That knowledge is imputed to the State and the prosecutors, regardless of whether the prosecutors subjectively knew about the prior interviews at the time of the hearing.

{¶58} Accordingly, we hold that Evans has satisfied the "knowledge" element of his due-process claim.

### C. Materiality

{¶59} Finally, we turn to the issue of materiality. Misconduct by state actors in criminal proceedings only violates the Due Process Clause if it deprives a defendant of life, liberty, or property. However, the point at which we say the State's malfeasance itself deprived the defendant of his liberty varies based on the nature of that malfeasance. We refer to this line variously as a standard of "materiality" or "prejudice." *See Strickler v. Greene*, 527 U.S. 263, 281-282 (1999) (using "materiality" and "prejudice" interchangeably to describe the standard for determining whether nondisclosure of favorable evidence violated the *Brady* rule).

{¶60} In the traditional *Napue* context, "a new trial is warranted so long as the

false testimony may have had an effect on the outcome of the trial—that is, if it in any reasonable likelihood could have affected the judgment of the jury." (Cleaned up.) *Glossip*, 604 U.S. at 246. This is comparable to the harmless-error standard, requiring "the beneficiary of the constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*; *accord United States v. Bagley*, 473 U.S. 667, 680, fn. 9 (1985) ("[T]he standard of review applicable to the knowing use of perjured testimony is equivalent to the *Chapman* harmless-error standard."). Because of the degree of culpability associated with perjured testimony and the difficulty of extricating its effects on proceedings, this materiality standard is demonstrably less onerous for the claimant than the more familiar "reasonable probability" standard applied to claimed violations of the rule in *Brady v. Maryland*, 373 U.S. 83 (1963). *Compare Bagley* at 682 (holding that, for *Brady*, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"), *with id.* at 678-680 (discussing the less onerous materiality standard for *Napue* claims).

{¶61} While some of the ordinary language of the *Napue* standard is geared toward jury trials, rather than bond hearings, the basic principle remains the same in both contexts: a trial court's decision denying bail is entered without due process if there is "any reasonable likelihood" that the State's knowing use of perjured testimony at the hearing "could have affected" the trial court's decision to deny bail. *See Glossip* at 246. In applying this standard, we must bear in mind that, under R.C. 2937.222(B), the State bears the burden of proving the bail-denial prerequisites by clear and convincing evidence—not beyond a reasonable doubt, as at a criminal trial.

{¶62} We must also bear in mind that the Due Process Clause imposes an *objective* standard, which requires us to "ask[] what a *reasonable decisionmaker*

24

would have done with the new evidence." (Emphasis added.) *Glossip* at 250. Assumptions that a factfinder "would have believed [the perjured witness] no matter what" have "no place in a materiality analysis." *Id.*

**{¶63}** In this case, the sheriff argues "that none of the matters about which Petitioner complains were in any way material to his 'no bail' hearing, because all of them concern his proposed self-defense claim." This irrelevance stems from the fact that, as the sheriff sees it, self-defense is "a trial issue that [is] in no way germane to the 'no bail' issue."

**{¶64}** First, even *if* self-defense were irrelevant to the bail-denial determination, Detective Grisby's credibility would not categorically be so. "Evidence can be material even if it 'goes only to the credibility of the witness,'" especially if that witness's testimony "was the only direct evidence" on a determinative point. *See Glossip*, 604 U.S. at 248, quoting *Napue*, 360 U.S. at 269.

**{¶65}** Second, and more substantively, the sheriff is wrong: evidence of self-defense *can be* material in a bail-denial hearing under R.C. 2937.222. To detain a defendant awaiting trial for an eligible offense without bail, the State must prove three things: (1) "that the proof is evident or the presumption great that the accused committed the [eligible] offense . . . with which the accused is charged," (2) "that the accused poses a substantial risk of serious physical harm to any person or to the community," and (3) "that no release conditions will reasonably assure the safety of that person and the community." R.C. 2937.222(B).

**{¶66}** As we explained in *Evans I*, self-defense is irrelevant to the first prong of R.C. 2937.222(B). *Evans I*, 2024 Ohio App. LEXIS 4355, at *7 (1st Dist.). Where a defendant like Evans admits to knowingly shooting the victim "but argues that he did so in self-defense," he necessarily concedes the basic elements of a homicide offense.

25

*See State v. Gillis*, 2024-Ohio-726, ¶ 44 (8th Dist.); *see also State v. Smith*, 2018-Ohio-2504, ¶ 56-57 (1st Dist.). "Self-defense and defense of another are affirmative defenses that legally excuse otherwise unlawful conduct." *State v. Shinholster*, 2024-Ohio-1606, ¶ 18 (1st Dist.). Thus, where the State produces evidence that the defendant knowingly shot the victim, and the defendant raises only self-defense, the proof will generally be evident or the presumption great that the defendant committed a homicide offense—even though he may not be *criminally liable* for doing so.

**{¶67}** But R.C. 2937.222 is conjunctive, not disjunctive. Before a trial court can deny bail, it must *also* determine that the defendant "poses a substantial risk of physical harm to any person or to the community" and that "no release conditions will reasonably assure th[eir] safety." In so doing, the court is directed to consider (1) the "nature and circumstances of the offense charged, including whether the offense is an offense of violence or involves alcohol or a drug of abuse," (2) the "weight of the evidence against the accused," (3) "the history and characteristics of the accused," and (4) the "nature and seriousness of the danger . . . that would be posed by the person's release." R.C. 2937.222(C).

**{¶68}** The sheriff's suggestion that evidence of self-defense is categorically irrelevant to these considerations is incompatible with the statute's text. For example, evidence of self-defense plainly goes to the "circumstances of the offense charged," which must be considered under R.C. 2937.222(C)(1). Imagine two defendants, A and B. The evidence clearly and convincingly shows that both defendants purposely shot and killed their respective victims. Defendant A *broke into the victim's home* in the middle of the night to shoot the victim. Defendant B, on the other hand, shot the victim after the victim *broke into the defendant's home*. The difference between the two concerns circumstances that suggest self-defense in one case, but not the other. The

sheriff would have us believe that these two defendants pose an equally "substantial risk of serious physical harm to any person or to the community" under R.C. 2937.222. But common sense dictates that Defendant B poses a lesser risk to the community, because the circumstances of the two offenses suggest only that Defendant B is willing to kill those who break into his home, while Defendant A is willing to break into the homes of others to kill them.

**{¶69}** Nothing in the statute blinds a trial court to the basic intuition that an individual who kills in self-defense generally poses a lesser danger to the community that the one who kills *offensively*. Indeed, the statute's instructions to consider the "nature and circumstances" of the offense and the "nature and seriousness of the danger posed" by the defendant *compel* the trial court to take cognizance of such facts. The sheriff's contrary reading inserts a limitation into R.C. 2937.222(C)(1) and (4) found nowhere in the statute's text.

**{¶70}** Turning to this case, we conclude that Detective Grisby's false statements clearly could have contributed to the denial of bail. As discussed above, Detective Grisby falsely testified that no witness told her D.P. had a gun and that no witness had described D.P. acting violently toward or going after persons other than Evans that night. In fact, Detective Grisby knew that at least one witness *had said* that D.P. had a gun. And two witnesses *had described* D.P. as threatening violence against, pursuing, and assaulting one or more individuals with Evans that night. The testimony of these witnesses tends to support Evans's claim of self-defense—a claim Evans has pressed since he turned himself in shortly after the shooting. These statements would tend to make it more likely that Evans reasonably feared for his life at the moment he fired the gun. They also cast doubt on Detective Grisby's credibility as a narrator. A reasonable factfinder *might* still have denied Evans bail, but we cannot say so with any

degree of certainty—especially when Detective Grisby's testimony was the sole source of all relevant facts regarding the shooting before the trial court.

{¶71} Because we cannot say with confidence that the use of the false testimony in this case did *not* alter the trial court's assessment of the risks Evans posed, we hold that the failure to correct Detective Grisby's false statements was material for *Napue* and due-process purposes.

## IV. JUDICIAL BIAS CLAIM

{¶72} Evans further asks that any new hearing be conducted by a different judge. But the Chief Justice of the Supreme Court of Ohio (or her designee), not this court, has statutory authority to disqualify judges for bias or prejudice upon the filing of an affidavit of disqualification. *See* R.C. 2701.03; *Hill v. Hikel*, 2025-Ohio-2161, ¶ 11 (1st Dist.). At times, this court can address judicial bias that rises to the level of a due-process violation on direct appeal. *See id.* at ¶ 12, quoting *State v. Loudermilk*, 2017-Ohio-7378, ¶ 20 (1st Dist.). But even assuming that we could do something similar on a pretrial writ of habeas corpus, Evans has not come close to showing that any appearance of impropriety here rises to the level of a due-process violation. We therefore decline Evans's request to order that a new judge conduct any future bail-denial hearings.

## V. CONCLUSION

{¶73} The order denying Evans bail was obtained following a hearing at which the sole fact witness knowingly made false statements of material fact. The hearing therefore failed to comport with the constitutional requirements of due process.

{¶74} In the absence of a valid bail-denial order, Evans is bailable, and his continued detention without bail is unlawful. Accordingly, we order that a writ of habeas corpus issue to the sheriff ordering her to produce the body of El-Hajj Evans.

We further order that Evans be admitted to bail, *see* R.C. 2725.18, on the same terms he was given prior to his bail-denial hearing: "$750,000 secured with Electronic Monitoring Device (EMD) and Juris Monitoring." However, this order shall pose no bar to detaining Evans without bail, should the trial court hold a new bail-denial hearing after the date on which this opinion is entered and issue a new order denying Evans bail under R.C. 2937.222.

Writ granted.

**BOCK, J.,** concurs.
**ZAYAS, J.,** dissents.